807 A.2d 32

**WESTERN CORRECTIONAL INSTITUTION, Department of Public Safety & Correctional Services.**

v.

**Jeffrey GEIGER.**

**William Mullen & Robert Pflaumer,**

v.

**Department Of Public Safety & Correctional Services.**

**Nos. 41, 31 Sept. Term, 2000.**

**Court of Appeals of Maryland.**

**Sept. 18, 2002.**

Michele J. McDonald, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, on brief), Baltimore, for Western Correctional Institution and Dept. of Public Safety and Correctional Services.

Lisa M. O'Mara (Davis and Associates Law Offices, P.A., on brief), Towson, for Jeffrey Geiger.

Travis M. Mastroddi (Joel A. Smith of Kahn, Smith & Collins, P.A., on brief), Baltimore, for Robert Pflaumer and William Mullen.

Argued before BELL, C.J. ELDRIDGE, RODOWSKY *, RAKER, WILNER, CATHELL, and HARRELL JJ.

BELL, Chief Judge.

This appeal[1] requires the Court to interpret a portion of the State Personnel Management System Reform Act of 1996. *See* Md.Code (1993, 1997 Repl.Vol.) § 11–106 of the State

---

\* Rodowsky, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Consisting of three cases, two of which have been formally consolidated, the dispositive issues in each of these cases are common, although the results below arguably were inconsistent.

Personnel & Pensions Article.[2] More particularly, we must determine whether the thirty day period prescribed by § 11–106(b) for the imposition of disciplinary action commences when the appointing authority[3] is first informed of the allegation of misconduct, as the disciplined employees contend, or, as argued by the State, only when the appointing authority is informed of the results of an investigation that substantiates such allegation. We must also decide whether § 11–106(b) envisions a burden-shifting analysis, as the Court of Special Appeals held. If the answer to the first question is that the period is inclusive of the allegation, we finally must address the significance of there being no sanction for violation, prescribed in the statute.[4] We shall hold that the thirty day

---

**2.** Unless otherwise noted, future statutory references are to the State Personnel & Pensions Article.

**3.** Pursuant to Md.Code (1993, 1997 Repl.Vol.) § 1–101(b) of the State Personnel & Pensions Article, " '[a]ppointing authority' means an individual or a unit of government that has the power to make appointments and terminate employment."

**4.** In their Petition for Certiorari, petitioners Robert Pflaumer and William Mullen raised the single question, "When, under State Personnel & Pensions Article § 11–106, does an appointing authority 'acquire knowledge of misconduct' sufficient to trigger the thirty (30) day limitations period?" In their brief, consistent with the cross Petition for Certiorari filed by respondent Department of Public Safety and Correctional Services, which we also granted, they added and addressed two additional questions, *i.e.*

"When State Management issues discipline in an untimely manner under State Personnel & Pensions Article § 11–106, what is the appropriate remedy?

"Does State Personnel & Pensions Article § 11–106 envision a standard of investigatory 'reasonableness' to be demonstrated under a burden-shifting analysis?"

In its Petition for Writ of Certiorari, the Department of Public Safety and Correctional Services presented three questions:

"Did the Court of Special Appeals err by interjecting into the statutory disciplinary scheme a burden-shifting analysis unsupported by the statute and regulations?

"Did the Court of Special Appeals err in applying its own the burden-shifting analysis, where the court both failed to apply the reasonable diligence standard articulated in its opinion and failed to remand the case to the administrative agency for the purpose of taking evidence on the new issues raised by the court?

period includes the time necessary for the appointing authority to conduct its investigation and meet the other requirements specified in § 11–106(a), in the process rejecting the intermediate appellate court's burden shifting analysis. We also shall hold that rescission of the discipline imposed is the appropriate sanction for the appointing authority's failure to meet § 11–106(b)'s time limit.

I

The employees in each of the cases under review were disciplined pursuant to § 11–106, which prescribes the "[d]uty of appointing authority prior to imposing sanctions." Section 11–106 provides:

"(a) Procedure.—Before taking any disciplinary action related to employee misconduct, an appointing authority shall:

"(1) investigate the alleged misconduct;

"(2) meet with the employee;

"(3) consider any mitigating circumstances;

"(4) determine the appropriate disciplinary action, if any, to be imposed; and

"(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.

"(b) Time Limit.—Except as provided in subsection (c) of this section, an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed.

"(c) Suspension.—

---

"Where the statute that permits an appointing authority to impose a disciplinary termination does not provide any sanction or consequence for its violation, does an appointing authority's failure to impose discipline within thirty days mandate reversal of the termination?"

Respondent Geiger also filed a cross Petition for Certiorari, which we granted. The question he posited was:

"Whether the 30-day time limit contained in § 11–106(b) applies to the time in which Management must investigate allegations of misconduct prior to the imposition of discipline."

"(1) An appointing authority may suspend an employee without pay no later than 5 workdays following the close of the employee's next shift after the appointing authority acquires knowledge of the misconduct for which the suspension is imposed.

"(2) Saturdays, Sundays, legal holidays, and employee leave days are excluded in calculating the 5–workday period under this subsection."

In each case, the appointing authority disciplined the employee more than thirty days after receiving knowledge of an allegation that the employee had engaged in misconduct or of a situation that could have resulted in that employee's being disciplined.[5]

Jeffrey Geiger, a Correctional Officer II at the Western Correctional Institution ("WCI"), was terminated for making offensive racial comments, including use of the word "nigger," in a conversation with Regina Waites, a nurse at the facility. On March 7, 1997, Mrs. Waites met with WCI's Warden, the appointing authority, and reported the offensive conversation. The Warden requested that the Internal Investigation Unit ("IIU") investigate the allegations, the result of which—the investigating officer concluding that, in fact, Mr. Geiger had used the racial slur, "nigger," during his conversation with Mrs. Waites, in violation of state and departmental standards [6] —he received on April 11, 1997. Thereafter, on April 21, 1997, having conducted a mitigation conference with Mr. Geiger, who admitted using the racial slur,[7] the Warden completed

---

**5.** The latter is the situation in the *Pflaumer* case, where the triggering event was an incident report that contained no allegations of misconduct and actually was written by the employee ultimately disciplined, petitioner Pflaumer.

**6.** As a part of the investigation, Mrs. Waites along with three other nurses and three correctional officers were interviewed and 22 exhibits collected, including reports from the persons interviewed, daily rosters, disciplinary action records, and complaints.

**7.** Mrs. Waites, whose husband is African American, alleged that Mr. Geiger repeatedly used the racial slur in reference to the inmate

a Notice of Termination charging Mr. Geiger with violating departmental standards and MD. REGS.CODE tit. 01, § 01.1995.19 (1995), which prohibits harassment and discrimination. The Notice was sent to the Secretary of the Department of Public Safety and Correctional Services ("DPSCS"), who, as required by § 11–104(7),[8] approved the termination on May 2, 1997. Mr. Geiger received and signed the Notice on May 6, 1997.

On August 29, 1997, William Mullen, a Correctional Officer II of the Roxbury Correctional Institution, was given a written reprimand for initiating an unsanctioned investigation of a fellow officer, Officer Brenda Shepherd, in violation of departmental standards of conduct and performance. The allegations were communicated to the Warden, the appointing authority, on March 27, 1997 and the Warden caused an investigation to be initiated. That investigation was completed on August 6, 1997 and forwarded to the Warden on August 8, 1997.[9]

---

population, as well as to the Warden, and in an extremely derogatory manner. Although Mr. Geiger denied making the statements attributed to him, he admitted to having used the word "nigger," stating, "Hey ... It's a common word ... really." He also offered that it was regularly used by employees of the correctional institution at Jessup, where he previously worked.

**8.** Section 11–104(7) of the State Personnel & Pensions Article empowered the appointing authority, "with prior approval of the head of the principal unit," to take the following disciplinary actions against an employee:

(i) terminate the employee's employment, without prejudice; or
(ii) if the appointing authority finds that the employee's actions are egregious to the extent that the employee does not merit employment in any capacity with the State, terminate the employee's employment, with prejudice.

Although substantively identical, that provision now is codified as § 11–104(6). See 1999 Md. Laws, ch. 207, § 1, deleting former subsection (3) and renumbering the remaining provisions.

**9.** The Internal Investigative Unit Report summarizing the chain of events giving rise to the investigation of Mr. Mullen, as well as the conclusions of that investigation, was dated July 7, 1997, but was not released to the Warden until August 8, 1997. It was completed on

Robert Pflaumer, a Correctional Officer II at the Eastern Correctional Institution was terminated following an internal investigation into the disappearance of a set of "grand master" keys, while he was the key control officer for the institution.[10] On January 28, 1997 the Warden and appointing authority was informed that the keys charged to Mr. Pflaumer's care were missing. On January 31, 1997, the Warden instituted an investigation into the disappearance of the keys, which was concluded on February 19, 1997. Thereafter, on February 25, 1997, the Warden met with Mr. Pflaumer to discuss the incident and, on the same date, completed a Notice of Termination, which after approval of the Secretary of DPSCS on March 4, 1997, was served on Mr. Pflaumer on March 10, 1997.

In each case, the discipline imposed was overturned by administrative law judges ("ALJ") of the Office of Administrative Hearings ("OAH"), each finding that the discipline was untimely under § 11–106, it having been imposed more than thirty days after the allegation of misconduct, or a situation from which misconduct could be found, had been reported to

---

August 6, 1997, when the Commanding Officer of IIU reviewed and signed it.

**10.** On January 27, 1997, Mr. Pflaumer reported that the keys were missing in a "Matter of Record" report to his supervisor. In that report, he described the incident as follows:

"On the above date [1–27–97] and approx. time [2:45 p.m.], I officer Pflaumer was conducting a quarterly inspection of the institutional Emergency sets, which are housed in Tower 8. Emergency keys are housed in two key boxes which are secured by padlocks. During inventory of the sets I noticed 99 set missing. I then had the Tower 8 officer double check my count. The missing set contains 20 EKGMK 1, 2, 3, 4, GGMK, PMK. These are all grand master key sets for East and West compounds. I called the former key control officer to find out if they were taken down for repair and never put back; he stated that the [keys] should be up there and did not know of their whereabouts. At approx. 3:50 Chief Irwin was advised of the missing set. All control key boxes and [the] key vault were checked twice with nothing found. All persons having access to [the] key vault were asked about the missing set. The last entry of issue was on Oct. 23 at 8:27 a.m. by this officer for a mock exercise. All keys were returned by myself at 2:35 p.m. on 23rd of Oct."

the appointing authority. The reasoning of the ALJ in the *Geiger* case is typical. Rejecting the State's argument that the thirty day period prescribed by § 11–106(b) is flexible and runs from the completion of the investigation mandated by § 11–106(a), it proceeded:

> "A reading of the statute ... reveals that the appointing authority has thirty days to conduct an investigation, meet the employees, consider any mitigating circumstances, determine the appropriate action and to give notice to the employee. Implicit in these requirements is that the appointing authority acquire knowledge of the misconduct, be it as an allegation or as a conclusion after investigation."

Thus, in *Geiger*, the ALJ concluded:

> "I am not convinced that the narrow reading of ... § 11–106 suggested by Management is required. Instead, I find that a reading of this section of law imposes a thirty day window for Management to receive the allegations of misconduct, to investigate and to impose sanctions. As such, I conclude that the thirty day window began with the reporting of the allegation to the Warden on March 7, 1997 and that the Warden contacted the DOC/IIU who opened their investigation on March 11, 1997. The appointing authority thus had 30 days from March 7, 1997 to investigate the allegations and to then impose any disciplinary sanctions deemed to be warranted after the completion of the investigation. Because this time frame was not met in this case the Employee's argument must prevail and the Notice of Termination issued by Management on May 2, 1997 must be rescinded."

Similarly, in *Mullen*, the ALJ stated:

> "The Employee has adequately shown that the thirty day window began with the reporting of the allegation to the Warden in February, 1997 and that the Warden contacted DOC/IIU on March 27, 1997. The Appointing authority thus had 30 days from at least March 27, 1997 to investigate the allegations and to then impose any disciplinary sanctions deemed to be warranted after the completion of the investi-

gation. Because this time frame was not met in this case, the Employee's argument must prevail and the reprimand issued by management must be rescinded."

And in *Pflaumer*, the ALJ

"Construed the Notice to show that the appointing authority acquired knowledge of the misconduct on January 28, 1997, the day the Warden was given the Employee's January 27, 1997 report. Within the next thirty days, the investigation was completed (2/19/97), the Warden met with the Employee to discuss the matter (2/25/97), and the Warden signed the Notice of Termination (2/25/97).[11]

"The Notice terminated the Employee on March 10, 1997."

On judicial review, the Circuit Court for Washington County and the Circuit Court for Somerset County reversed the *Mullen* and *Pflaumer* decisions respectively. Both Circuit Courts concluded that the thirty day period prescribed by § 11–106(b) does not commence with a mere allegation of misconduct. The *Mullen* court, relying on the absence of the word "alleged" to modify "misconduct" in § 11–106(c)(1), when its predecessor provision so provided, opined that "[i]t is patently obvious that the Legislature intentionally decided to change the triggering event for the appointing authority's duty to act from a date when he learned of the *alleged* misconduct under the old law to a date when he acquired knowledge of confirmed or proven misconduct, *i.e.*, beyond a mere assertion of misconduct." It also rejected the argument that subsection (b) modifies subsection (a) and thus § 11–106(b) mandates that all of the requirements set forth in § 11–106(a) be accomplished within thirty days, reasoning:

"[T]he plain and unambiguous language contained in § 11–106(b) and (c) requires the appointing authority to take

11. The ALJ also rejected the State's argument that Mr. Pflaumer's "Matter Report" could be the triggering event for the imposition of discipline pursuant to § 11–106, pointing out:

"[Counsel for the State] further argued that the Employee allegedly engaged in misconduct during the investigation, and after its conclusion. Were that so, Management could simply amend the statement of charges in the Notice to include any additional misconduct."

disciplinary action or impose a suspension, respectively, within designated time periods after the appointing authority *acquires knowledge of the misconduct*—not after the appointing authority acquires knowledge of the *alleged* misconduct. To accept Mullen's argument would require adding the word 'alleged' in both subsections (b) and (c) of § 11–106. Such construction would be in contravention of the Legislature's intent since the Legislature used the word 'alleged' in the predecessor statute *and* employed the term 'alleged misconduct' in § 11–106(a)(1). In short, it can only be presumed that the Legislature knew precisely what it was doing when it chose not to use the term *alleged* misconduct in § 11–106(b) and (c)."

Noting that when he reported the keys as missing, Mr. Pflaumer did not indicate that he was responsible, the Circuit Court for Somerset County determined:

"On January 28, 1997, when Warden Beshears was first informed of the missing keys, he had no reason to believe that there had been any misconduct, on the part of Pflaumer or any other ECI employee. There was no knowledge of employee misconduct acquired by the Warden until the Warden received the results of the investigation on February 19, 1997.

"Respondent is arguing that DPSCS must conduct an investigation and impose any discipline within thirty days of learning of any incident which may have been a result of employee misconduct. Taken to its logical end, Respondent's argument would require absurd results. For example, if an incident occurred and an investigation was immediately launched, even if the most credible evidence of misconduct was discovered on the thirty-first day of the investigation, the DPSCS could impose no discipline because of the thirty day limitations period, such an interpretation would force DPSCS, at the end of the thirty days, to either forego any discipline or 'rush to judgment' and take disciplinary action. Such a ludicrous result was not intended by the General Assembly, and the Court refuses to interpret the statute in that manner."

A different result was reached by the Circuit Court for Allegany County. Noting that the statute is not a model of clarity on the issue of when the thirty day period prescribed by § 11–106(b) for the imposition of discipline begins and, after reviewing the available legislative history, the court concluded:

"It does not appear that the Legislature intended the 30 day period was to be triggered only after an investigation was concluded. Such a construction would render the time limitation meaningless. An investigation could consume nearly any time period as subjectively determined by a particular appointing authority. Uniformity in the application of disciplinary policies throughout the various State agencies would be sacrificed. When a particular appointing authority 'acquires knowledge of the misconduct' must depend on the specific facts of each case. However, it cannot be conditioned on the conclusion of an investigation by or on behalf of that authority."

In addition, it addressed and rejected the State's argument, premised on *Resetar v. State Bd. of Education*, 284 Md. 537, 548, 399 A.2d 225, 231 (1979) and *Motor Vehicle Admin. v. Shrader*, 324 Md. 454, 467, 597 A.2d 939, 946 (1991), that the administrative law judge erred in concluding that the failure of the appointing authority to comply with the provisions of § 11–106(b) should result in rescission of the termination. The court reasoned:

"The Court believes the rule/statute considered in *Resetar* and *Shrader* [is] distinguishable from Code, § 11–106(b). The instant statute not only sets a time limit, it specifies what may be done during the period. That is, impose disciplinary action. By implication, the statute prohibits imposition of discipline beyond that period. Otherwise, the term 'time limit' as used by the Legislature would be meaningless."

In unreported opinions in *Mullen* and *Pflaumer*, and a reported one in *Geiger, Western Correctional Institution v. Geiger*, 130 Md.App. 562, 747 A.2d 697 (2000), the Court of

Special Appeals affirmed the judgments of the Circuit Courts. In so doing, the intermediate appellate court held that:

> "(1) the limitation period is triggered by knowledge that is sufficient to justify the appointing authority's decision to initiate disciplinary action; (2) when the disciplined employee makes a *prima facie* showing that the appointing authority has failed to comply with the limitation period provided for by § 11–106(b), the appointing authority must prove by a preponderance of evidence that this section was not violated; and (3) the appointing authority is prohibited from imposing disciplinary action more than 30 days after it has acquired—or, with the exercise of reasonable diligence, should have acquired—knowledge sufficient to justify taking disciplinary action against the employee."

*Geiger*, 130 Md.App. at 565–66, 747 A.2d at 699.[12]   Largely agreeing with the *Mullen* and *Pflaumer* courts on the trigger point, while expressly rejecting the circuit court's analysis in *Geiger*, the intermediate appellate court interpreted § 11–106(b) to authorize a flexible starting point, one that "does not start until the appointing authority has—or, in the exercise of reasonable diligence, should reasonably have—acquired enough knowledge to justify the imposition of discipline," and to permit an employee to generate "the issue of whether the 30 day-limit had been violated," which the employer must then rebut.  *Id.* at 569, 747 A.2d at 701.   It also developed a procedure for implementing this burden shifting analysis:

> "[W]hen a disciplined employee contends that the time limitation of § 11–106(b) has not been complied with, the employee must overcome the presumption of correctness by making a *prima facie* showing that the appointing authority was 'on notice' of the alleged misconduct more than 30 days before the disciplinary action was imposed.  If the employee does succeed in showing, *prima facie*, that the appointing authority was on notice of the purported misconduct on a day more than 30 days before the employee was ultimately

---

**12.**  Although the *Mullen* and *Pflaumer* opinions are unreported, their holding is the same and, indeed, identically stated.

disciplined, the disciplinary action shall be rescinded unless the appointing authority proves by a preponderance of the evidence that (1) the investigation required by § 11–106(a)(1) was conducted with reasonable diligence, and (2) the disciplinary action at issue was imposed no later than 30 days after the required investigation had been completed."

*Id.* at 569–70, 747 A.2d at 701.

Applying this analysis, the Court of Special Appeals concluded in the *Mullen* and *Pflaumer* cases that:

"(1) [the employee] made a prima facie showing that the disciplinary action at issue was imposed more than 30 days after the appointing authority had acquired knowledge of his misconduct; (2) [the State], however, proved that this was a . . . case in which the investigation required by § 11–106(a)(1) could not reasonably have been completed until a date within 30 days of the date on which discipline was imposed [13]; and (3) the [C]ircuit [C]ourt was therefore correct in reinstating the discipline about which [the employee] complains."

In *Geiger,* on the other hand, a different conclusion was reached with respect to the State's rebuttal of the employee's prima facie case. The intermediate appellate court determined that the State "utterly failed to prove that the investigation in this case could not have been completed until a date within 30 days of the date on which the discipline was imposed." *Geiger,* 130 Md.App. at 571, 747 A.2d at 702. Consequently, in *Geiger,* the intermediate appellate court was required to address an issue that it declined to consider in *Mullen* and *Pflaumer:* the proper sanction for an appointing authority's failure to impose discipline within the thirty day period prescribed by § 11–106(b).

On that issue, the Court of Special Appeals sided with the Circuit Court for Allegany County, which had concluded that the appropriate sanction for noncompliance with § 11–106 was

---

**13.** The Court of Special Appeals characterized the *Mullen* case as "most unusual."

rescission of the disciplinary action imposed. Satisfied "that the prime reason for the addition of a limitation period in 1996, where none had existed before, was to provide protection to workers from the indefinite threat of investigation and discipline (other than suspension) for matters of misconduct," *id.* at 570, 747 A.2d at 702, the court reasoned:

> "The legislative history shows that the General Assembly wished to limit the period of time in which the appointing authority could impose, for example, a reprimand or termination. The 1996 State Personnel Management System Reform Act was enacted to, *inter alia,* provide for a more consistent application of state-wide policies and procedures. That important goal is inconsistent with the proposition that a violation of § 11–106(b) can be excused whenever the appointing authority concludes that untimely disciplinary action is justified by some overriding public policy. We therefore hold that the appropriate remedy for an appointing authority's non-compliance with § 11–106(b) is an order rescinding the discipline imposed. To hold otherwise would render illusory the protection provided to State employees by § 11–106(b)."

*Id.* at 570, 747 A.2d at 702.

We granted the Petition for Writ of Certiorari filed by Mullen and Pflaumer, and the cross petition filed by the State. *Pflaumer v. Department of Public Safety,* 359 Md. 28, 753 A.2d 1 (2000). Subsequently, we granted the State's Petition for Writ of Certiorari filed in the *Geiger* case and Geiger's cross-petition. *WCI v. Geiger,* 359 Md. 335, 753 A.2d 1033 (2000). We shall reverse the judgment of the Court of Special Appeals in *Mullen* and *Pflaumer* and, for reasons different than those on which the intermediate appellate court relied, affirm the judgment in *Geiger.*

## II

Repeatedly, we have emphasized that "the paramount object of statutory construction is the ascertainment and effectuation of the real intention of the Legislature."

*Whiting–Turner Contracting Co. v. Fitzpatrick,* 366 Md. 295, 301, 783 A.2d 667, 670 (2001). *See Robinson v. State,* 353 Md. 683, 694, 728 A.2d 698, 703 (1999); *Degren v. State,* 352 Md. 400, 417, 722 A.2d 887, 895 (1999); *Wesley Chapel v. Baltimore,* 347 Md. 125, 137, 699 A.2d 434, 440 (1997); *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995). In seeking to ascertain legislative intent, we first look to the words of the statute, *see Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 126, 756 A.2d 987, 990 (2000); *Harris v. State,* 353 Md. 596, 606, 728 A.2d 180, 184 (1999); *Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128, 1131 (1998); *Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.,* 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997); *Stanford v. Maryland Police Training & Correctional Comm'n,* 346 Md. 374, 380, 697 A.2d 424, 427 (1997) (quoting *Tidewater v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995)), viewing them "in ordinary terms, in their natural meaning, in the manner in which they are most commonly understood." *Derry v. State,* 358 Md. 325, 335, 748 A.2d 478, 484 (2000); *see also Sacchet v. Blan,* 353 Md. 87, 92, 724 A.2d 667, 669 (1999); *Whack v. State,* 338 Md. 665, 672, 659 A.2d 1347, 1350 (1995). "Where the statutory language is plain and free from ambiguity, and expresses a definite and simple meaning, courts do not normally look beyond the words of the statute itself to determine legislative intent." *Degren,* 352 Md. at 417, 722 A.2d at 895 (citing *Marriott Employees,* 346 Md. at 444–45, 697 A.2d at 458); *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987); *Hunt v. Montgomery County,* 248 Md. 403, 414, 237 A.2d 35, 41 (1968). Nor may a court under those circumstances add or delete language so as to "reflect an intent not evidenced in that language," *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 755 (1993), or construe the statute with " 'forced or subtle interpretations' that limit or extend its application." *Id.* (quoting *Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69, 73, 517 A.2d 730, 732 (1986)).

Only when the statutory language is unclear and ambiguous, will courts look to other sources, such as the legislative history. *Degren,* 352 Md. at 417, 722 A.2d at 895;

*Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992). We neither add words to, nor delete words from, a clear and unambiguous statute to give it a meaning not reflected by the words the Legislature chose to use, and we do not engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. *Taylor v. Nationsbank,* 365 Md. 166, 181, 776 A.2d 645, 654 (2001); *Mid–Atlantic Power Supply Ass'n v. Public Service Comm'n,* 361 Md. 196, 204, 760 A.2d 1087, 1091 (2000). Moreover, whenever possible, the statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory. *Taylor,* 365 Md. at 181, 776 A.2d at 654; *Chesapeake Amusements, Inc. v. Riddle,* 363 Md. 16, 29, 766 A.2d 1036, 1042 (2001); *Mid–Atlantic Power Supply Ass'n,* 361 Md. at 204, 760 A.2d at 1091. And a statute is to be given a reasonable interpretation, not one that is illogical or incompatible with common sense. *State v. Brantner,* 360 Md. 314, 322, 758 A.2d 84, 88–89 (2000); *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990); *Blandon v. State,* 304 Md. 316, 319, 498 A.2d 1195, 1196 (1985); *Erwin and Shafer, Inc. v. Pabst Brewing Co.,* 304 Md. 302, 315, 498 A.2d 1188, 1194 (1985).

We have acknowledged that in determining a statute's meaning, courts may consider the context in which a statute appears, including related statutes and, even when a statute is clear, its legislative history. *See Morris v. Prince George's County,* 319 Md. 597, 604, 573 A.2d 1346, 1349 (1990); *see also Kaczorowski v. Mayor and City Council of Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 633 (1987). We have cautioned, however, that this inquiry is "in the interest of completeness," *Harris v. State,* 331 Md. 137, 146, 626 A.2d 946, 950 (1993), "to look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." *Id.* That inquiry, in other words, we emphasized in *Chase,* "is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute." *Chase, supra,* 360 Md. at 131, 756 A.2d at 993; *see also Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49, 54 (1977) ("a court may not as a general rule

surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature.").

■ The statutory provision at the heart of these cases is § 11–106 of the State Personnel & Pensions Article. Subsection (a) sets forth the duties of the appointing authority prior to imposing discipline. It provides that the appointing authority shall, before imposing any discipline for employee misconduct,

"(1) investigate the alleged misconduct;

"(2) meet with the employee;

"(3) consider any mitigating circumstances;

"(4) determine the appropriate disciplinary action, if any, to be imposed; and

"(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights."

Subsection (b) addresses the restriction on the time for imposing such disciplinary action. Counting from when "the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed" and excepting suspensions without pay, pursuant to subsection (c), the appointing authority has thirty days to impose any disciplinary action. With respect to subsection (c), counting from the same knowledge base, the time limitation is five (5) days.

The phrase in subsection (b), "when the appointing authority acquires knowledge of the misconduct," is not defined and no guidance, beyond its context in the statutory scheme, has been provided. To be sure, when considered alone and in isolation, it is ambiguous; from the language alone, it is impossible to elucidate the quantum of knowledge sufficient to trigger the time limit. Viewed in context, however, the phrase is not ambiguous and, in fact, clearly pinpoints when the time limit for imposing disciplinary action starts. All three subsections of § 11–106 are interrelated; one can not be read and interpreted without reading and interpreting the others. Subsection (a) prescribes what must be done before imposing discipline, subsection (b) sets the general time limitation on

when the imposition of discipline must occur and subsection (c) provides a special time limit for suspensions without pay.

■ It is significant that one of the prerequisites for the imposition of discipline is the conduct of an investigation of the alleged misconduct. To be sure, as the Court of Special Appeals observed, "[t]here is an important distinction between (1) information that indicates the necessity for an investigation, and (2) the completion of an investigation required by § 11–106(a)(1)." *Geiger,* 130 Md.App. at 569, 747 A.2d at 701. The intermediate appellate court, thus, drew a distinction between the quantum of knowledge the appointing authority must have at the beginning of the process and at the end, when the investigation is complete, settling on a level of knowledge sufficient to justify the imposition of discipline.[14] Section 11–106(b) does not, by its terms, state a distinction between the amount of knowledge necessary to initiate an investigation and that required to discipline. It simply prohibits the imposition of discipline more than thirty days after knowledge of the misconduct for which the disciplinary action is imposed is acquired. Knowledge sufficient to order an investigation is knowledge of the misconduct for which discipline was imposed, if discipline ultimately is imposed for that misconduct. It is not at that stage in the process, to be sure, proof as to who is the responsible person and may not even be knowledge as to who that person is. Section 11–106, however, is not person specific; it is situation and fact based. Thus, the knowledge that triggers the running of the thirty day period need not, and may not, although it generally will, identify the employee ultimately disciplined.

■ We hold that, viewed in context, § 11–106 gives the appointing authority 30 days to conduct an investigation, meet

---

14. This is the degree of knowledge acquired from the results of the investigation, notwithstanding the Court of Special Appeals' suggestion to the contrary and its permitting the employee to attempt to prove that the requisite knowledge was acquired earlier. The intermediate appellate court's unwillingness to adopt a "conclusion of the investigation" test of knowledge likely reflects its recognition that such a standard would render the time limit in § 11–106(b) superfluous.

with the employee the investigation identifies as culpable, consider any mitigating circumstances, determine the appropriate action and give notice to the employee of the disciplinary action taken.[15]

## III

The legislative history of § 11–106 confirms our interpretation. Determining that there was a need for "a personnel management system that is more flexible, decentralizes personnel management functions, simplifies and streamlines personnel procedures and provides for the consistent application of personnel policies throughout a diverse State government," Governor Glendening, by Executive Order No. 01.01.1995.15, dated June 9, 1995, established the Governor's Task Force to Reform the State Personnel Management System. He

---

15. The State finds persuasive that § 11–106(a)(1) references "alleged misconduct," in contrast to § 11–106(b) and (c), neither of which uses "alleged" to modify "knowledge of the misconduct." It also argues that the complete phrase in subsections (b) and (c), "knowledge of the misconduct for which the disciplinary action was imposed," connotes substantiated misconduct and, so, is inconsistent with knowledge of alleged misconduct. Finally, the State notes that the prior statute pertaining to the imposition of a suspension without pay, Md.Code § 9–403(a)(2) (1994), specified "alleged infraction" as one of the triggering events for its imposition. We are not persuaded.

An investigation, of necessity, is of "alleged misconduct." As already pointed out, knowledge sufficient to initiate an investigation is, when the investigation substantiates the misconduct and the culpable party, "knowledge of the misconduct for which the disciplinary action was imposed." That there was a different trigger prior to passage of the Personnel Reform Act of 1996 also is not very persuasive when it is recalled that the Act, and for our purposes, the provision under review, was the result of a Task Force Report, whose recommendation in that regard was enacted substantially as submitted.

The Circuit Court for Somerset County, in *Pflaumer*, interpreting § 11–106(b) as the ALJ did, opined that to require the imposition of discipline take place within thirty days of acquiring knowledge sufficient to initiate an investigation, would lead to absurd results—"if an incident occurred and an investigation was immediately launched, even if the most credible evidence of misconduct was discovered on the thirty-first day of the investigation, the DPSCS could impose no discipline because of the thirty day limitation period." The strength of a bright line rule is its certainty. Ensuring certainty is not an absurd result.

charged the Task Force with conducting a "comprehensive review of the Maryland State Personnel Management System contained in Division I of the State Personnel and Pensions Article to determine necessary and appropriate revisions to that law." The Task Force submitted its Final Report on January 19, 1996 and its findings and recommendations were subsequently introduced in the General Assembly as the State Personnel Management System Reform Act of 1996. One of the recommendations had the clear purpose of limiting the time in which disciplinary action could be imposed by an appointing authority. That recommendation, obviously the precursor of § 11–106(b), provided:

"B. Conduct—Relation Discipline—(2) After acquiring knowledge of alleged employee misconduct, an appointing authority shall have up to 30 calendar days to impose all forms of discipline detailed in Section 11 with the exception of suspension without pay. Within the 30 day time period, the appointing authority must investigate; meet with the employee; consider mitigating circumstances; and issue the discipline to be taken.

Task Force To Reform the State Personnel Management System; Report to the Governor, January 19, 1996, pgs. 44–45. Cross-filed as Senate Bill 466 and House Bill 774, as enacted, *see* 1996 Md. Laws, ch. 347, the legislation was passed in substantially the same form as proposed by the Task Force.

Documents in the legislative file, submitted as the legislation progressed through the General Assembly, provide additional evidence that the time limit was intended to include the investigatory period. Acting Secretary of Personnel and Chair of the Task Force on Personnel Reform, Michael A. Glass, submitted written testimony commenting on the effect of proposed § 11–106:

"In cases of conduct related discipline, the proposal establishes a uniform 30 day time period in which management may investigate, meet with the employee, and impose discipline with one exception: to impose a disciplinary suspension, the appointing authority must act within 5 days."

Another written memorandum from the Department of Personnel to the House Subcommittee on Personnel is to like effect, indicating that § 11–106:

"[I]mposes the general rule that the appointing authority has 30 days after acquiring knowledge of the misconduct to impose discipline. In cases where suspension is determined to be the appropriate penalty, the appointing authority has 5 work days following the close of business after the employee's next shift after acquiring knowledge to impose the suspension.

"This provision provides for the first time that the appointing authority has to conduct its investigation within a certain amount of time for all cases of discipline."

Finally, Mr. Glass, in a memorandum on the Task Force's recommendations to the Governor, contrasted the provisions of proposed § 11–106 and the prior legislation, Md.Code State Pers. & Pens. § 9–403(a)(2) (1987, 1994 Repl.Vol.), which permitted suspension without pay "within 2 days from the close of the employee's next shift after: (i) the alleged infraction occurred; or (ii) the appointing authority learned of the alleged infraction," pointing out that the proposed legislation:

"[i]ncreases the time allowed an appointing authority to investigate and impose disciplinary suspension from two days to five days following the close of the employee's next shift; allows the appointing authority up to thirty calendar days to impose any other form of discipline."

### IV

Having determined that the thirty day period prescribed by § 11–106(b) is the maximum time allowed for imposing disciplinary action, we must address the issue that the State raised in its cross petition for certiorari in *Geiger*, namely, whether reversal, as a result of the rescission of the disciplinary action, is the appropriate sanction for its violation. The State relies on *Shrader, supra,* arguing that it supports the proposition that the sanction for noncompliance with a mandatory statutory provision is not necessarily dismissal.

In *Shrader,* at issue was the interpretation of a provision of the Transportation Article, specifically Md.Code (1987, 1991 Cum.Supp.) § 16–205.1(f)(5)(i) of the Transportation Article, which provided:

> "If the person requests a hearing at the time of or within 10 days after the issuance of the order of suspension ... the Administration shall set a hearing for a date within 30 days of the receipt of the request."

*Shrader,* 324 Md. at 462, 597 A.2d at 942. Notwithstanding that the provision was mandatory and that timely requests for hearings were made, but hearings were not timely scheduled, within the thirty day time frame prescribed by the statute, *id.* at 462, 597 A.2d at 943, the Court held that dismissal was not the appropriate sanction, stressing the purpose of the statute (to protect the public, rather than the driver), *id.* at 464, 597 A.2d at 943, the lack of a sanction being specified in the statute, *id.* at 467–69, 597 A.2d at 945–46, and the lack of prejudice to drivers. *Id.* at 469–70, 597 A.2d at 946–47.

Applying that analysis to the case *sub judice* demands, the State submits, that the Court reach the same result. It reasons that the purpose of overhauling the State personnel system was to improve governmental efficiency and public service,[16] that § 11–106 does not specify a sanction for a

---

16. To reach this conclusion, the State relies on Md.Code § 2–301(a) and § 6–102 and the Governor's Executive Order. *See* Md. Regs.Code tit. 01, § 01.1995.15. Section 2–301(a) states the "purpose of restructuring the State's personnel system," "(a) in keeping with State efforts to reinvent government, restructuring of the State's personnel system should enhance the delivery of services to citizens in an effective and timely manner." Section 6–102 provides:

> "The basic purpose of the State Personnel Management System is to provide a system of employment for employees under the authority of the Secretary. The State Personnel Management System:
> "(1) (i) establishes categories of service for employees based on the general nature of the employee's duties or method of appointment; and
> "(ii) provides procedures for the appointment, discipline, and termination of employees in each service;
> "(2) (i) groups employees into classes based on specific duties that employees perform; and
> "(ii) provides a system of pay for employees;

violation of its thirty day time limit, and that Geiger, in particular, was not prejudiced, in any event, by the noncompliance, as he remained fully employed and continued to receive wages and benefits. Moreover, the State stresses that overturning the termination of an employee who uses epithets, "thereby demonstrating his racism and threatening institutional security and undermining morale," does not increase the efficiency of State government or improve public safety.

The Court of Special Appeals reached the opposite result, as we have seen. Acknowledging that § 11–106 does not provide for a sanction expressly, but, relying on *Lussier v. Maryland Racing Comm'n,* 343 Md. 681, 686–87, 684 A.2d 804, 806–07 (1996), the intermediate appellate court noted that "[w]hen a statute that imposes a duty does not prescribe the consequences for a violation of that duty, the particular sanction must be within the spirit and purpose of the applicable law" and concluded:

> "In examining § 11–106 within the context of the Act's overall statutory scheme and as it relates to the agency's own implementing regulations, it appears that the prime reason for the addition of a limitation period in 1996, where none had existed before was to provide protection to workers from the indefinite threat of investigation and discipline (other than suspension) for matters of misconduct."

*Geiger,* 130 Md.App. at 570, 747 A.2d at 702. From the legislative history, the intermediate appellate court deter-

---

"(3) provides for a system of merit employment in the skilled service and professional service, regardless of an applicant's political or religious opinions or affiliations or of any standard other than business efficiency;

"(4) provides a process for the:

"(i) promotion and training of employees; and

"(ii) prompt removal of employees; and

"(5) provides for other aspects of human resources management."

The Executive Order stated the ultimate objective of the Task Force as being "the creation of a modern human resources management system which streamlines and simplifies the State's personnel policies and provides for the consistent application of human resources management principles throughout the Executive Branch of State Government." COMAR 01.01.1995.15 C.(2).

mined that the Legislature intended to limit the amount of time an appointing authority had to take disciplinary action and that one of the purposes of enacting the 1996 State Personnel Management System Reform Act was to provide a more consistent application of statewide policies and procedures.[17] The latter important goal, it held, was "inconsistent with the proposition that a violation of § 11–106(b) can be excused whenever the appointing authority concludes that untimely disciplinary action is justified by some overriding public policy" because such an interpretation would "render illusory the protection provided to State employees by § 11–106(b)."

To be sure, § 2–301(a) does state the purpose of restructuring the State personnel system. Subsection (b) of the section, however, addresses the "duties of employees," and included within its provisions is one, the very first one, in fact, that is clearly favorable to, and intended to benefit, employees. That provision requires that "[t]o maintain efficient and effective operations of State government, each State employee ... shall be treated with fairness in State employment." § 6–102(1). Moreover, that subsection also provides that each employee "is entitled to the rights and protections in this title." § 6–102(6).

Certainly, simplifying and streamlining State personnel policies promotes efficiency and benefits the public by improving the delivery of services. Those improvements do not, however, preclude the same benefits from flowing to, and indeed being intended for, the employees, especially when another purpose of the restructuring process was "the consistent application of human resources management principles throughout the Executive Branch of State Government." Consistent application of policy, while productive of efficiency, has significant implications as to the right each employee has to be treated fairly and is, in fact, one of the protections to which each employee expressly is entitled.

---

17. This reference is to the Executive Order, the very provision upon which the State presumably relies. *See* COMAR 01.01.1995.15 C.(2).

The Circuit Court for Allegany County distinguished § 11–106(b) from the rule considered in *Resetar* and the statute construed in *Shrader* on the basis that § 11–106(b) "not only sets a time limit, it specifies what may be done during the period." Because it provides for the imposition of disciplinary action, the court reasoned, "[b]y implication, the statute prohibits imposition of discipline beyond that period. Otherwise, the term 'time limit' as used by the Legislature would be meaningless." We agree.

There is, moreover, more relevant Maryland case law supporting the proposition that dismissal is the appropriate sanction for non-compliance with a mandatory time requirement in a statute. *See In re James S.,* 286 Md. 702, 410 A.2d 586 (1980); *State v. Hicks,* 285 Md. 310, 403 A.2d 356 (1979); *U.S. Coin and Currency v. Director of Finance,* 279 Md. 185, 367 A.2d 1243 (1977). *Hicks* makes the point quite clearly that the sanction of dismissal is designed to ensure compliance with an unambiguously mandatory time requirement. *Hicks,* 285 Md. at 316–18, 403 A.2d at 359–60. Section 11–106(b) is an unambiguously mandatory time requirement in which discipline must be imposed.

THE JUDGMENTS IN CASE NO. 31, MULLEN AND PFLAUMER, REVERSED; JUDGMENT IN CASE NO. 41, GEIGER, AFFIRMED. CASE NO. 31 REMANDED TO THE COURT OF SPECIAL APPEALS, WITH DIRECTIONS TO REMAND TO THE CIRCUIT COURTS FOR WASHINGTON AND SOMERSET COUNTIES FOR ENTRY OF JUDGMENT CONSISTENT WITH THIS OPINION. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS, IN EACH CASE, TO BE PAID BY THE STATE.

Concurring Opinion by RODOWSKY, J.

RODOWSKY, Judge, concurring.

I join in the Court's mandate and, with the exception of the last paragraph, in the Court's opinion.