908 A.2d 137

## DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT

v.

Arthur HOFFMAN.

No. 1785, Sept. Term, 2005.

Court of Special Appeals of Maryland.

Sept. 22, 2006.

Kevin J. Leonard, Crownsville, MD, Steven M. Sullivan, Baltimore, MD (Jan M. Bryant, Crownsville, MD, J. Joseph Curran, Jr., Atty. Gen., Baltimore, MD, on the brief), for Appellant.

Lisa M. O'Mara Arnquist (Davis & Associates, on the brief), Towson, MD, for Appellee.

Panel: JAMES R. EYLER, KRAUSER and WOODWARD, JJ.

KRAUSER, Judge.

Arthur Hoffman, appellee, was employed as an real estate appraiser by the Maryland Department of Housing and Community Development ("the Department"), appellant. That employment ended when the Department learned from a recent decision of this Court, *Hoffman v. Stamper*, 155 Md. App. 247, 843 A.2d 153 (2004) (*Hoffman I*),[1] that Hoffman had participated in a "flipping"[2] scheme, before he joined the Department. The scheme involved fraud and conspiracy to defraud, as well as violations of the Consumer Protection Act[3] and "ethical codes and uniform standards governing appraisers." *Id.* at 301 n. 13, 843 A.2d 153. To be more specific, he was judicially found to have violated the former by materially misrepresenting in his appraisals the value of what were falsely claimed by his co-conspirators to be "rehabbed" properties and the latter by knowingly destroying records of appraisals.

Challenging his termination on several different grounds,[4] appellee filed an administrative appeal. When his discharge

---

1. We designate this Court's decision in that case *"Hoffman I"* to distinguish it from the Court of Appeals's decision in the same case, *Hoffman v. Stamper*, 385 Md. 1, 867 A.2d 276 (2005), which we shall refer to as *"Hoffman II."*

2. "Flipping" is the colloquialism for the act of buying property at a low price and quickly reselling it for profit. It "is not illegal per se; however, when an immediate resale is attended by acts of fraud or misrepresentation, including but not limited to, appraisals with inflated property values and other misleading or fraudulent documentation, it can result in a predatory transaction." Fannie Mae Announcement 04–07 on Illegal Flipping, *available at* http://www.efanniemae.com/sf/guides/ssg/annltrs/pdf/2004/04–07.pdf.

3. Maryland's Consumer Protection Act, Md.Code (1975, 2005 Repl. Vol.), §§ 13–101 through 13–501 of the Commercial Law Article, "prohibits unfair and deceptive trade practices in the sale of consumer real estate ... and in the extension of consumer credit, including the financing of consumer realty." *Hoffman I*, 155 Md.App. at 310, 843 A.2d 153.

4. In his "Statement Personnel Management System Appeal and Grievance Form," appellant asserted:

was upheld by an administrative law judge ("ALJ") of the Office of Administrative Hearings, he petitioned the circuit court for judicial review. But, in doing so, he did not dispute any of the ALJ's findings of fact, nor did he question whether his misconduct warranted termination. Instead, he confined his attack to one issue: the timeliness of the Department's actions.

The Department, Hoffman asserted, had failed to discharge him within thirty days of having "acquire[d] knowledge" of his misconduct, as mandated by Md.Code (1993, 2004 Repl.Vol.), § 11–106(b) of the State Personnel and Pensions Article, and that delay had rendered his discharge unlawful. The circuit court agreed, reversed the decision of the OAH on that ground, and remanded this case to that office, for it to determine whether Hoffman was "entitled to any pay or benefits he may have lost" as a result of his termination.

The Department appealed that decision, asking us to resolve the question of whether it acted within the statutorily-mandated thirty days. We conclude that it did and therefore reverse the judgment of the circuit court.

## FACTS

The facts are not in dispute. They show that Hoffman was employed as an appraiser in the private sector when he applied for the position of Real Property Review Appraiser II with the Department. In early 1998, Hoffman was interviewed for that position by a panel consisting of L. Paul Hickin, Stanley Sanders, and Jeffrey Goldman, all of whom later served as Hoffman's supervisors at some point during his employment. At that time, no civil suit had been filed against

---

This disciplinary action was taken without regard to procedures set forth in [State Personnel and Pensions §] 11–106(a) and (b). Management had knowledge more than 30 days before the termination. I was not given a notice of Termination, there was no investigation, the Appointing Authority registered with DBAM and did not investigate, meet with me, consider mitigation or impose this termination.

Hoffman or any of his co-defendants for any work he had performed in the private sector.

Hoffman disclosed to the interviewing panel that he and several others were under investigation for "questionable real estate practices." But he did not divulge the nature of the allegations, and assured the three-membered panel that his appraisals were "honest," leaving at least one member of the panel to later confess that he suspected no wrong-doing because of "how easy it is [for an appraiser] to make an honest mistake."

The panel recommended to Earl De Maris, who was, at that time, the Department's Director of the Division of Credit Assurance, that Hoffman be hired. In making that recommendation, it advised De Maris that Hoffman was being investigated for "questionable real estate practices," but, at the same time, assured De Maris that Hoffman had not been charged with any misconduct.

After the Department's Deputy Secretary, Raymond Skinner, and Director of Employee Services and Human Resources, Rodney J. Wiesinger, approved Hoffman's hire, his employment with the Department began on March 25, 1998. Hoffman's duties included appraising residential properties reclaimed by the Department from low-income owners who had defaulted on mortgages financed through the Department's Real Estate Owned unit.

In August of 1998, Hoffman and several others were sued in the Circuit Court for Baltimore City for fraud, conspiracy to defraud, and violations of the Consumer Protection Act. Hoffman and his co-defendants were essentially accused of acquiring inexpensive, dilapidated residential properties, misleading prospective buyers into believing they were purchasing "rehabbed" houses, or, at least, houses that would be completely renovated by the time of settlement, misrepresenting the appraised value of the properties, and then selling the properties to those buyers at highly inflated prices. *Hoffman I*, 155 Md.App. at 268, 843 A.2d 153. After settlement, the buyers were left with properties that were "either uninhabitable or in

seriously decayed condition, and [were] worth far less than the mortgage loan[s] taken to buy [them]." *Id.*

The specific role Hoffman played in this scheme was critical to its success. The scheme involved obtaining Federal Housing Administration-backed ("FHA") loans for the buyers. To obtain an FHA loan to purchase property, an FHA-approved appraiser—in this instance, Hoffman—had to inspect the property, and the appraised value had to reflect at least the purchase price of the property on which the loan was extended. *Id.* at 278, 843 A.2d 153. Hoffman valued each property for the purchase price or $500 above it. *Id.* at 279, 843 A.2d 153. To reach what were inflated values, he used false information furnished by his co-defendants "conceal[ing] that the information in fact was tainted and unreliable." *Id.* at 300, 843 A.2d 153. The values Hoffman arrived at for five of the eight properties at issue in *Hoffman I* "greatly exceeded even the highest possible value ranges." *Id.* at 301, 843 A.2d 153.

After the suit was filed, Hoffman told his supervisor, L. Paul Hickin, that he was the subject of a lawsuit, but did not disclose to Hickin that the suit involved allegations of intentional acts of wrongdoing, that is, fraud and conspiracy to commit fraud. Although Hoffman did mention the suit to others in the Department, he "didn't go into details" and thus left his listeners with either little understanding of what was involved or with the assumption that it was "an errors and omissions problem." [5]

In 1999, Hoffman's "questionable real estate practices" came to the attention of George Eaton, who succeeded De Maris as Director of the Division of Credit Assurance, the unit in which Hoffman served as an appraiser. Eaton believed, as others did, that the case against Hoffman involved "some possible discrepancies in [Hoffman's] appraisals." Given that appraising is "not an exact science," Eaton "thought it was a negligence issue." He nonetheless checked the status of

---

**5.** This was the testimony of Stanley Sanders, one of Hoffman's supervisors.

Hoffman's license and found that it was current. He also informed the Department Secretary, Deputy Secretary, and Principal Counsel of Hoffman's situation. They, in turn, advised him to tell Hoffman to keep them informed.

In 2000, Hoffman told Eaton and Jeffrey Goldman, who was Hoffman's direct supervisor at the time, that he had been found not guilty of the allegations against him, though the record contains no evidence, other than his testimony,[6] that criminal charges had ever been contemplated, much less brought. Later that year, Hoffman informed Eaton that he was involved in a lawsuit. Assuming that the suit involved negligence issues, Eaton asked Hoffman to keep him apprised of its progress, but, to be on the safe side, once again reviewed the status of Hoffman's license and found that it was current.

The next year, in 2001, Hoffman told Eaton that his errors and omissions insurance policy[7] would cover the lawsuit, thereby confirming the prevailing misimpression that his legal troubles were related to issues of negligence. That year, Hoffman also told Goldman that a civil suit had been brought against him, although, as before, he did not provide any details.

In January of 2002, after a jury in the Circuit Court for Baltimore City found Hoffman and his co-defendants liable for fraud, conspiracy to defraud, and violations of the Maryland Consumer Protection Act, and entered a judgment against

---

**6.** A footnote in the ALJ's opinion explained that, in the course of Wiesinger's investigation into Hoffman's misconduct, "no evidence was produced that [Hoffman] was ever charged with criminal conduct. Rather, [Hoffman] presented [Wiesinger] with a letter from his attorney indicating that the Assistant United States Attorney had no further interest in him as a witness."

**7.** An errors and omissions insurance policy " 'insure[s] members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes and errors inherent in the · practice of the profession.' " *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill.2d 384, 189 Ill.Dec. 756, 620 N.E.2d 1073, 1078 (1993) (quoting 7A J. Appleman & J. Appleman, *Insurance Law & Practice* § 4504.01 (rev. 1997)).

them in the amount of $3.2 million,[8] Hoffman informed Goldman that he had lost the lawsuit, but "[h]e did not advise," as the ALJ observed, "anyone in DHCD management" of the loss. Once again, Hoffman was short on specifics, but he did inform Goldman he intended to file an appeal.

On February 27, 2004, this Court issued a decision in *Hoffman I.*[9] 155 Md.App. 247, 843 A.2d 153. Holding that the circuit court had erred in granting the defendants' motions for judgment on the plaintiffs' punitive damage claim and in granting attorneys' fees, the Court vacated the lower court's judgment solely as to those two issues. *Id.* at 344–46, 843 A.2d 153. Otherwise, it affirmed, in all respects, the judgments entered by the circuit court, which totaled $1.4 million in compensatory damages.

In rendering its decision, the Court determined that "[t]he evidence was sufficient to support the jury's finding, under a clear and convincing evidence standard, that Hoffman entered into a conspiracy . . . to defraud the buyers," *id.* at 301, 843 A.2d 153; that "Hoffman admitted destroying the records [pertaining to his appraisals] and knowing, when he did so, that his conduct was in violation of the ethical codes and uniform standards governing appraisers," *id.* at 301 n. 13, 843 A.2d 153; that "[t]he evidence also supported a finding of fraud against Hoffman independently," *id.* at 309, 843 A.2d 153; and that "the evidence was sufficient to support a reasonable finding that Hoffman engaged in unfair and deceptive trade practices in making material misrepresentations about value in the appraisals," *id.* at 314, 843 A.2d 153.

---

8. The $3.2 million judgment consisted of $129,020.03 in economic damages, $1,305,000.00 in non-economic damages, and $1,800,000.00 in punitive damages. *Hoffman I,* 155 Md.App. at 264, 843 A.2d 153.

9. On February 4, 2005, after the ALJ had conducted the hearing in the proceedings below, the Court of Appeals issued *Hoffman II,* affirming the judgments against Hoffman and his co-defendants but remanding the case to the circuit court for further proceedings as to damages. *Hoffman v. Stamper,* 385 Md. 1, 867 A.2d 276 (2005).

Two days later, on March 1, 2004, an article appeared in *The Daily Record*, a Maryland legal newspaper, discussing this Court's decision in *Hoffman I*. After reading the article and then the opinion itself, Eaton was, as the ALJ observed, "shocked because the facts surrounding the lawsuit were different than [Hoffman] had informed him." On March 3, 2004, Eaton brought the opinion to the attention of Department Secretary Victor L. Hoskins and Deputy Secretary Shawn Karimian. He also met with Wiesinger that day and recommended that Hoffman be fired.[10]

Wiesinger launched an investigation into Hoffman's misconduct. After interviewing Eaton, Goldman, Sanders, Hoffman's past and present immediate supervisors, and Hoffman himself, Wiesinger recommended to Deputy Secretary Karimian that Hoffman be discharged. That recommendation was thereafter approved by Secretary Hoskins. On March 19, 2004, Wiesinger advised Hoffman by letter that his employment would be terminated effective April 2, 2004.

Although Hoffman had a satisfactory performance record, the Department could not ignore that Hoffman had been found to have engaged in fraud and deceit in the preparation of appraisals and had knowingly destroyed appraisal records. Fearing that Hoffman's continued employment would undermine the Department's credibility and expose it to future litigation, the Department discharged him.

Hoffman subsequently appealed his termination to the Office of Administrative Hearings ("OAH"). On October 15, 2004, an evidentiary hearing before an ALJ was held. After rejecting Hoffman's claims that the termination was untimely and that he had not received adequate notice of his termination, the ALJ found that Hoffman had been properly terminated for "[b]eing guilty of conduct that has brought or, if

---

10. At all relevant times, Wiesinger, along with Secretary Hoskins and Deputy Secretary Karimian, were "appointing authorities" for the Department. Pursuant to State Personnel and Pensions § 11–104, an appointing authority may take certain disciplinary actions against any employee, including terminating the employee's employment.

publicized, would bring the State into disrepute," COMAR 17.04.05.04B(3); "[e]ngaging in conduct involving dishonesty, fraud, deceit, misrepresentation, or illegality," COMAR 17.04.05.04B(8); and "[c]ommitting another act, not previously specified, when there is a connection between the employee's activities and an identifiable detriment to the State," COMAR 17.04.05.04B(15).

In so finding, the ALJ explained:

I find that the Department has met its burden of proof, pursuant to COMAR 17.04.05.04B(3), to establish that the Employee engaged in conduct "that has brought or, if publicized, would bring the State into disrepute." The Court of Special Appeals' decision upholding the finding against the Employee as an appraiser for fraud and conspiracy to defraud, and violations of the Maryland Consumer Protection Act would bring the State into disrepute if he was to continue working for the State in the capacity of an appraiser.

I further find that the Department has met its burden of proof to establish that the Employee engaged in "conduct involving dishonesty, fraud, deceit, misrepresentation, or illegality," pursuant to B(8). The Court of Special Appeals' decision affirmed the Circuit Court's finding that the Employee was involved in the fraudulent residential property scheme.

I also find that the Department has met its burden to establish that the Employee committed an act, not previously specified, "when there is a connection between the employee's activities and an identifiable detriment to the State," pursuant to B(15). The destruction of appraisal records, as Mr. Eaton explained, not only constituted an ethical violation, but for a State-employed appraiser calls into question the reliability of their workfiles, which in turn, could raise questions in audits and with lenders.

On January 5, 2005, Hoffman filed a petition for judicial review in the Circuit Court for Anne Arundel County. After argument, the circuit court entered an order reversing the

OAH's decision and remanding the case to the OAH to determine whether Hoffman was entitled to any back pay or benefits. The Department filed a notice of appeal.

## DISCUSSION

█ State Personnel and Pensions § 11–106(b) provides that "an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed." [11] The appointing authorities acquire such knowledge, setting off the thirty-day clock, when the knowledge they have obtained is "sufficient to order an investigation." *W. Corr. Inst. v. Geiger,* 371 Md. 125, 144, 807 A.2d 32 (2002). And that occurs when they possesses "knowledge of an allegation that the employee had engaged in misconduct or of a situation that could have resulted in that employee's being disciplined." *Id.* at 131, 807 A.2d 32.

█ The ALJ determined that this did not happen until the appointing authorities—Wiesinger, Secretary Hoskins, and Deputy Secretary Karimian—learned from *Hoffman I,* which was published less than thirty days before Hoffman was

---

**11.** Section 11–206 reads in full:

(a) *Procedure.* Before taking any disciplinary action related to employee misconduct, an appointing authority shall:
(1) investigate the alleged misconduct;
(2) meet with the employee;
(3) consider any mitigating circumstances;
(4) determine the appropriate disciplinary action, if any, to be imposed; and
(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights.
(b) *Time limit.* Except as provided in subsection (c) of this section, an appointing authority may impose any disciplinary action no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed.
(c) *Suspension.* (1) An appointing authority may suspend an employee without pay no later than 5 workdays following the close of the employee's next shift after the appointing authority acquires knowledge of the misconduct for which the suspension is imposed.
(2) Saturdays, Sundays, legal holidays, and employee leave days are excluded in calculating the 5–workday period under this subsection.

terminated, that Hoffman's "legal problems" involved more than just negligence but fraud, conspiracy to defraud, and violations of the Consumer Protection Act in the performance of real property appraisals. In reviewing that determination, we apply the substantial evidence test. That test requires us to affirm an agency decision, if, after reviewing the evidence in a light most favorable to the agency, we find "a reasoning mind reasonably could have reached the factual conclusion the agency reached." *Bulluck v. Pelham Wood Apts.*, 283 Md. 505, 512, 390 A.2d 1119 (1978) (quoting *Dickinson–Tidewater, Inc. v. Supervisor of Assessments of Anne Arundel County*, 273 Md. 245, 256, 329 A.2d 18 (1974)) (some quotation marks omitted). Based on the evidence presented, we cannot conclude otherwise.

At the time he was interviewed by the Department, Hoffman gave no indication to the interviewing panel that he had engaged in any misconduct for which discipline could be imposed. His reference to "questionable real estate practices" was understandably discounted by the panel. Familiar with "how easy it is [for an appraiser] to make an honest mistake," they accepted his assurances that his appraisals were "honest." Moreover, Hoffman's argument that "the thirty day window was triggered when the Agency learned that Mr. Hoffman was under investigation for 'questionable real estate practices,'" not only presents an interesting twist of logic, but invites us to reward one more ethical lapse of his. He is, in effect, assuming the ethically untenable position of blaming the Department for accepting his deceptive assurances that his appraisals were "honest" and the legally untenable position of claiming that the Department was on notice as to his misconduct while he was concealing vital information concerning that conduct from the Department.

Furthermore, there was substantial evidence that the appointing authorities did not acquire knowledge of the misconduct during the period from 1999 to March of 2004. Although Eaton testified that, in early 1999, Hoffman told him that he was involved in a lawsuit, Eaton and others at the Department "thought it was a negligence issue," given that conducting

appraisals is "not an exact science." They assumed that his legal problems were attributable to "some possible discrepancies" in his appraisals. All the while, Hoffman's silence as to the details of his case contributed to this misunderstanding. Furthermore, Hoffman told Eaton that his errors and omissions insurance "would be able to cover everything."

Also, Sanders testified that he believed, based on several conversations with Hoffman, that it was an errors and omissions issue. Errors and omissions insurance policies are " 'designed to insure members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes and errors inherent in the practice of the profession.' " *Crum & Forster Managers Corp.*, 189 Ill.Dec. 756, 620 N.E.2d at 1078.

While Hoffman did disclose to his supervisors that he had been sued, civilly, at no time did he reveal the nature of that suit. Goldman testified that Hoffman had told him about the suit in 2001 or 2002, and that he had asked Hoffman to keep his supervisors apprised of the progress of the case, but that he "was never 100% clear on the matters involved in the case." "I didn't know," he asserted, "the depth or the involvement, other than that it was a civil case...."

Eaton, too, was left in the dark. He explained:

I knew that he was in a trial based on a civil suit. I did not know he had any charges brought up against him directly other than negligence or that he had used figures maybe that were inappropriate if somebody questioned his ability to appraise.... I did not know that he had been accused of any wrongdoing as far as fraud was concerned. I thought it was negligence, and I thought it was maybe errors or omissions.

Nor did the appointing authorities learn of the Baltimore City Circuit Court's verdict and judgment through Hoffman's 2002 State Ethics Commission Financial Disclosure Statement ("Disclosure Statement"), as Hoffman suggests. As the ALJ stated:

[Hoffman] testified that he listed the verdict and judgment in bold letters on his Disclosure Statement and did not submit it in a sealed envelope, as employees are permitted to do.

Mr. Wiesinger explained, however, that while the [Department's] personnel office gives the Disclosure Statement forms to the Employees, the Department does not keep a copy of the documents and no one in management sees a copy of the completed Disclosure Statement. Based on Mr. Wiesinger's testimony, which I credit, I find no evidence to conclude that the appointing authorities learned of the Baltimore City Circuit Court verdict and judgment against [Hoffman] through his Disclosure Statement.

Thus, there was substantial evidence that the Department did not possess knowledge sufficient to trigger an investigation until the publication of the *Daily Record* article, discussing this Court's decision in *Hoffman I*. Indeed, before the publication of that article, Hoffman's supervisors possessed only minimal information, which they thought indicated that Hoffman might have made an "honest mistake." Hoffman's disclosures suggested that, at most, there were allegations that he behaved negligently. Knowledge of allegations of "honest mistakes" that are "inherent in the practice of the profession," *Crum & Forster Managers Corp.*, 189 Ill.Dec. 756, 620 N.E.2d at 1078, is not "knowledge of an allegation that the employee *had engaged in misconduct* or of a situation *that could have resulted in that employee's being disciplined,*" *Geiger*, 371 Md. at 131, 807 A.2d 32 (emphasis added).

In any event, it is undisputed that Department officials did not learn of Hoffman's destruction of appraisal records in violation of ethical standards until reading about it in *Hoffman I*. Given that the destruction of these records was, in and of itself, grounds for terminating Hoffman's employment [12] and

---

**12.** Commenting upon the seriousness of this particularly egregious form of misconduct, the ALJ stated that Hoffman's destruction of appraisal records "not only constituted an ethical violation, but for a State-employed appraiser calls into question the reliability of their

the rule that each incident of misconduct for which a disciplinary measure is imposed gives rise to a separate thirty day period for imposing that measure, see *McClellan v. Dep't of Pub. Safety & Corr. Servs.*, 166 Md.App. 1, 31–32, 887 A.2d 45 (2005), there is no basis for reversing the ALJ's decision, even if she erred in finding that Hoffman's termination was untimely as to other acts of misconduct.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE DEPARTMENT OF HOUSING AND COMMUNITY DEVELOPMENT. COSTS TO BE PAID BY APPELLEE.**

workfiles, which in turn, could raise questions in audits and with lenders." That conduct alone, as noted, provided a basis for terminating Hoffman because, as the ALJ found, it constituted "[c]ommitting another act, not previously specified, when there is a connection between the employee's activities and an identifiable detriment to the State," under COMAR 17.04.05.04B(15).