929 A.2d 512

**DEPARTMENT OF PUBLIC SAFETY & CORRECTIONAL SERVICES**

v.

**John DONAHUE.**

**No. 84, Sept. Term, 2006.**

Court of Appeals of Maryland.

Aug. 1, 2007.

512

Michele J. McDonald, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., on brief), for petitioner/cross-respondent.

Lisa O'Mara Armquist (Davis & Associates Law Offices, P.A., on brief), Towson, for respondent/cross-petitioner.

Argued before BELL, C.J., RAKER, CATHELL,* HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (Retired, specially assigned), JJ.

---

* Cathell, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled

WILNER, J.

John Donahue was a correctional officer for the Department of Public Safety and Correctional Services (DPSCS). He held the rank of lieutenant and served at the Eastern Correctional Institution (ECI) in Somerset County. On March 10, 1997, DPSCS discharged Donahue. That action inaugurated a saga that has lasted, so far, more than a decade and has involved three administrative hearings, three judicial review actions in the Circuit Court for Somerset County, three appeals to the Court of Special Appeals, and two petitions for *certiorari* in this Court, the latter of which we granted. The issue now is whether he was properly discharged a second time, in November, 2002. We shall hold that he was.

## BACKGROUND

Donahue's first discharge, in March, 1997, arose from the disappearance of a set of keys at ECI. In his capacity as key control supervisor, Donahue was responsible for conducting a pre-audit inventory of emergency keys stored in Tower 8. He conducted such an inventory in November, 1996, and, although he noted a number of errors in the log book, he did not report any missing keys. In January, 1997, the key control officer reported that a set of emergency keys in Tower 8 was missing, including a master key that was capable of opening locks throughout the institution. Those keys were never found. There was never any allegation that Donahue had, himself, taken or lost the keys; he was charged, instead, with failing to conduct a proper inventory of the keys and failing to cooperate in the ensuing investigation.[1]

---

pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Donahue was charged with violating a number of specific Division of Correction Directives. The notice of termination stated as the reason for termination: "Due to Lt. Donahue's assigned key control responsibility, the likelihood that he last handled and/or misinventoried the keys, along with his attempts to deceive the investigators, proves that he cannot be trusted to protect the security of this institution and his removal from state service is required." This conclusion by the warden

Donahue's grievance over that termination eventually went to a hearing before an Administrative Law Judge (ALJ) at the Office of Administrative Hearings. In a decision and order filed in September, 1998, the ALJ sustained the termination. She found insufficient evidence to support the charges relating to the alleged failure to cooperate with the investigation but sustained the termination upon a finding that Donahue had violated a number of Division of Corrections Directives relevant to the duties of a key control supervisor and, in doing so, failed to perform those duties properly. In an action for judicial review, however, the Circuit Court for Somerset County, in August, 1999, reversed the termination decision and ordered that Donahue be reinstated to his position as Correctional Officer Lieutenant, with full back pay and restoration of benefits. At the request of DPSCS, the Circuit Court stayed its order pending an appeal to the Court of Special Appeals.

In an unreported opinion filed in June, 2000, the Court of Special Appeals agreed with the Circuit Court that the ALJ had erred in finding violations of the Directives pertaining to the conduct of the pre-audit inventory and thus in sustaining Donahue's termination. *DPSCS v. Donahue,* 132 Md.App. 729, S.T.1999, No.2031 (June 16, 2000). The appellate court concluded, however, that Maryland Code, § 11–110(d)(1) of the State Personnel and Pensions Article (SPP) allowed the ALJ some discretion as to the proper remedy. It therefore vacated that part of the Circuit Court's order requiring that Donahue be reinstated with full back pay and directed that the case be remanded to the ALJ for consideration of the appropriate remedy.

Following his termination and while the judicial review action was wending its way through the courts, Donahue obtained employment with the U.S. Postal Service in Easton.

seemed to be based on Donahue's alleged admission that he was the last person to have seen the missing keys, that he supposedly conducted an inventory of the keys in November, 1996, that the log book page where the inventory would have been entered was missing, and that some witnesses had stated that Donahue w as no t in the tower long enough to have conducted an inventory.

On September 17, 1999, a postal inspector reported to a detective with the Easton Police Department that Donahue had been observed opening yellow envelopes used for the payment of City of Easton parking citations and stealing the contents. The postal inspector had a videotape showing Donahue placing envelopes under his work table, opening those envelopes, placing the contents in his left pocket, resealing the envelopes, and placing them back in the mail system.

On this evidence, the two officers conducted a "sting" operation. The detective gave the postal inspector ten fictitious City of Easton parking citations. The inspector placed money with the citations and mailed them in the yellow parking ticket envelopes used by the City. On September 21, 1999, they surreptitiously observed Donahue place yellow parking ticket envelopes into the bin under his work station. He then went under the work station and, when he emerged, was seen placing something in his left front pocket. Donahue also opened several envelopes that were not part of the sting operation. Postal inspectors stopped Donahue outside the post office when he went on his lunch break and discovered in his pocket a $20 bill, a $10 bill, and ten $1 bills that matched the bills placed in the envelopes by the postal inspector.

Donahue was arrested and charged with two counts of wrongfully opening mail and one count of theft under $300. On December 15, 1999, he pled guilty in the District Court of Maryland to one count each of wrongfully opening mail and theft under $300, for which he received, on each conviction, a 60–day sentence, suspended in favor of probation and 100 hours of community service. It goes without saying that he was discharged from his employment with the Postal Service.

When, pursuant to the Court of Special Appeals mandate, the case was returned to the Office of Administrative Hearings, DPSCS sought an evidentiary hearing in order to present evidence of Donahue's post-termination criminal activity. It urged that his conviction rendered him unqualified for reinstatement. The ALJ rejected that entreaty. In essence, he concluded that the subsequent conviction was not a basis

for Donahue's termination *in that case* and that the only issue open on remand was whether, in light of the judicial conclusions that DPSCS had failed to provide sufficient evidence to support the charges underlying the termination, anything less than reinstatement with full back pay was warranted. The ALJ found that no evidentiary hearing was required on that issue—that Donahue was entitled to be reinstated with full back pay and benefits—and, on February 14, 2001, he so ordered.

DPSCS again sought judicial review. In an order entered in September, 2001, the Circuit Court for Somerset County affirmed the ALJ's decision, rejecting the effort of the Department to "shoehorn into these proceedings evidence of misconduct on the part of Lieutenant Donahue that would or could lead to his termination if he had been fully employed at the time of the misconduct." As it had done in the earlier proceeding, the Circuit Court stayed its judgment pending any appeal.

DPSCS did appeal. In another unreported opinion, filed July 3, 2001, the Court of Special Appeals affirmed the Circuit Court judgment, agreeing that the remand ordered in June, 2000, was a very limited one that did not encompass conduct occurring after Donahue's termination. *DPSCS v. Donahue,* 145 Md.App. 715, S.T.2001, No. 1705 (2002). The Court of Special Appeals mandate issued August 2, 2002. DPSCS then filed a petition for *certiorari* with this Court, which we denied on October 10, 2002. *See Department of Corrections v. Donahue,* 371 Md. 262, 808 A.2d 807 (2002).

A week later, on October 17, 2002, ECI Warden Robert Kupec received a memorandum from the Assistant Attorney General who had been handling the case for DPSCS stating that the Court of Special Appeals had ordered Donahue's reinstatement. The warden believed that his duty to reinstate Donahue commenced either on October 10, 2002, when this Court denied the petition for *certiorari,* or on October 17, when he received the Attorney General's memorandum. It appears that the memorandum also informed Warden Kupec

of Donahue's criminal conduct, which the warden, who had assumed his position long after Donahue had been discharged, claimed to have been unaware of earlier.

Upon being apprised of the mandate ordering restatement and Donahue's post-termination conduct, Warden Kupec ordered a background check to determine whether Donahue could maintain his certification by the Maryland Correctional Training Commission which, in the warden's view, was a qualification for employment as a correctional officer. In part upon the advice of the Assistant Attorney General, the warden concluded that Donahue's conviction would render him ineligible for employment, but, aware that the law required him to provide Donahue with an opportunity to "present anything in mitigation as to why we should not take action to prohibit him from returning as a correctional officer," the warden scheduled a "mitigation conference" for Friday, November 1.[2]

On October 25, 2002, Warden Kupec wrote to Donahue at his last known address in Salisbury, which was, in fact, his then-current address, informing him that "the Court of Appeals" had directed his reinstatement with full back pay and restoration of benefits and that the "effective date of your return" would be Friday, November 1, 2002. The warden actually sent two letters, one by certified mail and the other by regular mail, neither of which was returned to the sender. The identical letters directed Donahue to report to the warden's office at 8:00 a.m. on November 1 for "a mitigating conference regarding your continued employment" and admonished that he was not to enter any other part of the institution.

Unknown to the warden, or anyone else at ECI, Donahue was out of State at the time and did not return home until

---

2. As we shall discuss later, SPP § 11–106(a) requires an appointing authority, before taking any disciplinary action related to employee misconduct, to investigate the misconduct, meet with the employee, consider any mitigating circumstances, determine the appropriate disciplinary action, if any, to be imposed, and give the employee a written notice of the disciplinary action.

November 8, 2002, and he apparently had made no arrangement to check on voice-mail messages or for anyone to pick up his mail. He discovered what he said was a termination notice attached to his door when he arrived home and picked up his mail the next day, on November 9. He therefore did not receive the October 25 letter, or any other communication, until then and, as a result, failed to report on November 1. Upon his non-appearance that morning and unaware that Donahue was out-of-State, the personnel officer for ECI, Laura Dorsey, called Donahue at his home on three occasions. She said that she let the phone ring at least ten times, but there was no answer and no voice-mail pickup. The calls were to inform Donahue to report on Monday, November 4 for a rescheduled mitigation conference. Unable to reach Donahue, Ms. Dorsey asked Captain Matthews, w ho worked the 3: 00 to 11:00 p.m. shift, to try to reach him. Matthews stated that he called Donahue's number at least nine times on Friday night and Saturday, and possibly once on Sunday (November 1, 2, and 3). Matthews indicated that, on at least one occasion, an answering machine responded.[3]

Warden Kupec stated that several letters were sent to Donahue, that he had sent his administrative captain to Donahue's house in an attempt to deliver the letter personally, and that the captain had posted the letter on Donahue's door. Donahue said that, when he returned home on November 9, he found two notices taped to his door but that they were both notices of his termination.

---

3. Captain Matthews testified at the subsequent hearing before an ALJ on December 9, 2003. In support of his testimony regarding the telephone calls, a document evidencing those calls was marked for identification but, inexplicably, was not offered into evidence by the Assistant Attorney General. Matthews said that he provided the information in the document to Ms. Dorsey. In a November 7, 2002, memorandum from Ms. Dorsey to the warden, which was admitted into evidence at that hearing without objection, Ms. Dorsey recounted that Captain Matthews told her on Monday, November 4, that he had called Donahue's number nine times on Friday evening, that "once it rang busy, once he got the answering machine and did leave the message to report to your office at 8:00 AM on Monday; the other seven times he got no answer."

When Donahue failed to report on November 4, Warden Kupec scheduled a mitigation conference for November 7. There is no indication that any attempt was made to inform Donahue of that conference, and, of course, he did not appear. The warden met with Ms. Dorsey, reviewed the procedural history of the case, including Donahue's conviction, and concluded that, because the theft charge carried a possible prison sentence of more than one year and because he had been fired by another employer for theft, he was disqualified for employment under hiring guidelines established by the Correctional Training Commission. The warden recommended to the Secretary of DPSCS that Donahue be terminated from State service, on the grounds that:

"Mr. Donahue has demonstrated behavior that reflects negatively on the role of a professional correctional officer. Specifically, he has been convicted of theft and with his conviction his ability to provide the care and custody of inmates is seriously jeopardized; his theft, that is stealing money from mail is evidence of his moral turpitude and knowledge of his continued employment under these circumstances would be disruptive and offensive to his coworkers and the public and would have the effect of bringing the State into disrepute."

The next day, November 8, 2002, the Secretary approved the warden's recommendation and signed a Notice of Termination. The Notice stated that Donahue's conduct "clearly indicates behavior considered inappropriate, unbecoming and unprofessional for any Public Safety employee," that he was in violation of DPSCS Standards of Conduct, Section II.B. Personal Conduct, paragraphs 1 & 10; COMAR 17.04.05.04B. (3), (4), (8), & (15) and COMAR 12.10.01.03, and that termination was the "appropriate disciplinary action." [4] The notice was

---

4. The DPSCS Standards of Conduct were adopted pursuant to Division of Correction Directive 50–43. Part II sets forth Standards of Personal Conduct and Performance. Paragraph B. 1 of Part II provides, in relevant part, that each employee shall conduct himself, both on duty and off duty, in such manner as to reflect most favorably on the Department and that "any conduct," within or without the place of

posted on Donahue's residence door. The effect of this action was (1) to reinstate Donahue as an employee as of November 1, 2002, with back pay and restoration of benefits from March, 1997 through November 8, 2002, but (2) to terminate his employment, prospectively, effective November 8, 2002.

Donahue returned home on November 8 and learned at that time of his termination. He filed a grievance which, thirteen months later, ended up before an ALJ.[5] The ALJ saw the case as presenting two basic issues:

(1) whether DPSCS complied with two requirements of SPP § 11–106—subsection (a), which requires that the appointing authority meet with the employee and consider any mitigating circumstances before taking any disciplinary action, and subsection (b), which requires that any disciplinary action be taken within 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed, and

(2) whether the criminal conduct that occurred at a time when Donahue was not an employee of ECI constitutes grounds for termination.

The ALJ concluded that the Department had satisfied the requirement of § 11–106(b) but not that of § 11–106(a), and, for that reason, reversed the termination and, once again, ordered that Donahue be reinstated. Although that ruling made the second issue moot, the ALJ addressed it anyway and concluded that Donahue's conduct could constitute grounds for

employment, which tends to undermine the good order, efficiency, or discipline of the Department or reflects discredit on the employee or the Department shall subject the employee to disciplinary action. Paragraph 10 is more specific. It prohibits an employee from violating any State. Federal, or local law. COMAR 17.04.05.04B provides, in relevant part, that an employee may be disciplined for engaging in conduct which, if publicized, would bring the State into disrepute or which involves fraud, deceit, misrepresentation, or illegality.

5. The case was referred to the Office of Administrative Hearings in February, 2003, following an unsuccessful conference before the Department of Budget and Management. It was set for hearing in June, 2003, but was postponed at least twice. The hearing commenced December 9, 2003.

termination, even though it occurred after his employment had been terminated and thus when he was not an ECI employee.

With respect to SPP § 11–106(b)—the requirement that disciplinary action be taken within 30 days after the appointing authority acquires knowledge of the misconduct—Donahue argued that ECI was aware by early 2000 of his conviction for theft and opening the mail and that the 30–day clock began running on August 2, 2002, when the Court of Special Appeals issued its mandate affirming the Circuit Court judgment. The ALJ rejected that argument. Concluding that ECI had no authority to terminate or take any other disciplinary action against Donahue until be became reemployed, she found that the 30–day time period did not begin to run until Donahue was reinstated as an employee on November 1, 2002, and that, as the action was taken on November 8, there was no violation of § 11–106(b).

ECI did not fare so well with respect to the requirement in § 11–106(a) that the warden meet with Donahue and consider mitigating circumstances before taking disciplinary action. The ALJ noted that the statutory requirement, which facially seemed absolute, was qualified by a regulation of the Department of Budget and Management (COMAR 17.04.05.04D(3)), which added an exception to that requirement: "unless the employee is unavailable or unwilling to meet." The ALJ felt it unnecessary to consider whether the exception in the regulation was valid because she found that Donahue did not refuse to meet with the warden. Notwithstanding that the warden believed that the 30–day time period allowed under § 11–106(b) began to run either on October 17, 2002, when he was informed of the denial of *certiorari* by this Court, or October 10, when the petition for *certiorari* was actually denied, the ALJ found that it was unreasonable for the warden to proceed with a mitigation conference in the absence of Donahue when he had no proof that Donahue had received notice of the conference. The ALJ noted that the warden could have contacted counsel for Donahue and that, upon receiving notice that his certified letter to Donahue had been picked up on November 9, he could have rescheduled a meeting thereafter.

Indeed, the ALJ expressed doubt that ECI ever intended to consider such mitigating circumstances as the fact that Donahue had stolen only $40, that he was under stress, and that he h ad a previously good record of fourteen years of service.

Although, as indicated, the ALJ concluded that, in light of her reversal of the termination under SPP § 11–106(a), it was not necessary to determine whether Donahue's criminal conduct while employed with the USPS would constitute grounds for termination of employment with ECI, she concluded that it would. She observed that, if Donahue had been an active employee of ECI at the time, "there is no doubt that these convictions would support his termination from employment," that they "plainly constitute violations" of the Standards of Conduct and COMAR regulations cited by the warden, and that "[a]s the Warden credibly testified, he could not trust the Employee in ongoing employment, given his criminal record." The ALJ rejected Donahue's argument that his convictions would not have prevented him from being hired and concluded instead that, because the theft conviction carried a possible sentence of 18 months in jail, Donahue "would not have been eligible for hire" under DPSCS regulations.

DPSCS sought judicial review of the ALJ's determination that the warden was required to reinstate a person who was not eligible for employment and whom the warden "credibly" stated he could not trust. This time, the Circuit Court for Somerset County reversed the ALJ decision, finding several legal and factual errors in the ALJ's opinion. The court first noted that, although the ALJ correctly determined that Donahue had not demonstrated an "unwillingness" to meet with the Warden, she had failed to address or resolve whether the warden's unsuccessful attempts to notify Donahue prior to the mitigation conference rendered him "unavailable," and that she erred in leaving that issue unanswered: "by neglecting to make an 'unavailability' determination, the ALJ has failed to correctly interpret and apply the principles of law governing this case."

Upon the evidence presented, the court concluded that Donahue did, indeed, render himself unavailable. Recognizing that the warden, in hindsight, could have contacted Donahue's attorney (who acknowledged at oral argument before us that she had no idea where her client was), the court nonetheless found that the warden's efforts to notify Donahue were not unreasonable. The "bottom line," so to speak, was that "[i]t seems contrary to notions of common sense to conclude that in leaving the state and failing to take the simple steps of checking his phone messages, accounting for his mail, or informing his employer of his whereabouts for a period of 17 days, [Donahue] should not be considered 'unavailable.'"

In her opinion, the ALJ consistently referred to the mitigating conference, held without Donahue, as having occurred on November 1, 2002, when, in fact, it was held on November 7. Donahue conceded that the conference was held on November 7, but regarded the ALJ's contrary finding as merely a typographical and harmless error. The Circuit Court was not convinced. The ALJ's opinion, it noted, was "littered with references" to a November 1 meeting that were "juxtaposed with analysis pertaining to the reasonableness, appropriateness, or good faith of [the warden's] conduct," and the court was concerned that "the damaging impact of the ALJ's error of fact lies too perilously close to the underpinnings of her reasoning to conclude that [DPSCS's] substantial rights were not prejudiced." On those findings, the court, on October 4, 2004, reversed the ALJ's decision.

That produced an appeal by Donahue. In an unreported opinion filed August 8, 2006, the Court of Special Appeals reversed the Circuit Court judgment. It agreed with the Circuit Court (and the ALJ) that the warden had not violated SPP § 11–106(b), in that the 30–day period for taking a disciplinary action did not commence until November 1, 2002, when Donahue was reinstated as an employee. It disagreed with the Circuit Court, however, regarding the issue of unavailability and with the effect of the ALJ's erroneous reference to a November 1, 2002 mitigating conference. As to the latter, the appellate court concluded that, "[a]lthough it is a

close question, we agree that the date was most likely a typographical error."

With respect to unavailability, the Court of Special Appeals believed that the ALJ *had* considered whether Donahue was unavailable, even though she articulated no specific finding of availability. It agreed with the standard of unavailability adopted by the Circuit Court—that the employee is unavailable "when the employer undertakes reasonable, good-faith efforts to locate and procure the employee for the meeting but is nevertheless unable to do so"—but simply disagreed with the Circuit Court's determination that, under that standard, Donahue was unavailable. The appellate court observed that the warden had until November 30 to take disciplinary action, and, though acknowledging that the warden was under no *duty* to contact Donahue's lawyer, concluded that by "failing to take such an obvious step when the warden had good reason to know that [Donahue] was not at home and that there was a substantial likelihood that he had not received any notice of the mitigation hearing strongly indicates that a good-faith effort to make sure appellant had a chance to attend the hearing w as not made."

Neither party was happy with the Court of Special Appeals decision. We granted cross-petitions for *certiorari* and shall reverse the judgment of the Court of Special Appeals.

## DISCUSSION

DPSCS makes two complaints: that the Court of Special Appeals erred both in holding that Donahue was not unavailable and in determining that the ALJ's erroneous references to a November 1 mitigating hearing constituted merely a harmless typographical error. Donahue also makes two complaints: that reversal of the termination is required as a matter of law because it was not imposed within the 30 days allowed by SPP § 11–106(b) and that the ALJ erred in finding that his convictions relieved DPSCS from its obligation to reinstate him pursuant to the Court of Special Appeals August 2, 2002 mandate.

## *SPP § 11–106*

SPP § 11–106 imposes certain conditions on the taking of disciplinary action against a State employee. Subsection (a) requires the appointing authority, prior to taking a disciplinary action related to employee misconduct, to:

"(1) investigate the alleged misconduct;

(2) meet with the employee;

(3) consider any mitigating circumstances;

(4) determine the appropriate disciplinary action, if any, to be imposed; and

(5) give the employee a written notice of the disciplinary action to be taken and the employee's appeal rights."

Section 11–106(b) puts a time limit on this process. With an exception not relevant here dealing with the suspension of an employee, subsection (b) allows the appointing authority to impose any disciplinary action "no later than 30 days after the appointing authority acquires knowledge of the misconduct for which the disciplinary action is imposed." We made clear in *WCI v. Geiger,* 371 Md. 125, 129–30, 807 A.2d 32, 35 (2002) that the 30–day period allowed by § 11–106(b) "includes the time necessary for the appointing authority to conduct its investigation and meet the other requirements specified in § 11–106(a)" and that "rescission of the discipline imposed is the appropriate sanction for the appointing authority's failure to meet § 11–106(b)'s time limit."

### *The Thirty–Day Requirement*

■ Often, as in *Geiger,* the issue with respect to the 30–day requirement is when the appointing authority first acquired sufficient knowledge of the misconduct to trigger the commencement of the period, and, indeed, the parties quibble about that here. The warden insists that he was unaware of Donahue's criminal conduct until apprised of it by a memorandum from the Assistant Attorney General on October 17, 2002, whereas Donahue contends that the appointing authority knew of that conduct in 2000. Donahue is clearly correct on that

point, but it is not the relevant issue here.[6] As the ALJ and the Circuit Court recognized, the duties and time limit specified in SPP § 11–106 apply only to incumbent employees. An appointing authority can neither lawfully nor practically terminate the employment of someone who is not currently employed in the unit. What is there to terminate? Thus, the pertinent question is not when the appointing authority first became aware of the misconduct but when Donahue first became subject to discipline by the warden—at what point, charged with the institutional knowledge of the 1999 convictions, could the warden have commenced the process required by § 11–106, so that it could be completed within 30 days thereafter?

Donahue urges that he was effectively reinstated, and thus became an employee subject to discipline, on August 2, 2002, when the mandate of the Court of Special Appeals in No. 1705 issued. That mandate affirmed the judgment of the Circuit

---

6. Robert Kupec assumed the position of warden of ECI on October 14, 1999. Donahue had been discharged in March, 1997, and apparently had no contact with the institution or its warden since then. Warden Kupec said that he did not know Donahue and was unaware of the December, 1999 convictions until informed of them by the Assistant Attorney General's letter in October, 2002. That may well be the case, but there can be no doubt that his predecessor as appointing authority was aware of the convictions when the matter of Donahue's first termination was remanded to the ALJ by the Court of Special Appeals in June, 2000. Upon that remand, DPSCS, through its Assistant Attorney General, insisted that it be permitted to present evidence of those convictions in furtherance of its position that Donahue should not be reinstated. In determining when the appointing authority first had knowledge of the misconduct ultimately relied on for the disciplinary action, we must look at when the appointing authority who *first* acquired knowledge of the misconduct obtained that knowledge. SPP § 1–101(b) defines "appointing authority" as "an individual or unit of government that has the power to make appointments and terminate employment." Section 3–215(b)(3)(i) of the Correctional Services Article provides that "[t]he warden of a correctional facility is the appointing officer for the officers and other employees of that facility." In this context, the appointing authority is the office of the warden, and knowledge of the misconduct is acquired by that office when it is first imparted to an incumbent in that office. If that person then leaves, the office and any successor incumbent is necessarily charged with that knowledge.

Court, which, in turn, affirmed the ruling of the ALJ that Donahue be reinstated with back pay. Unquestionably, upon the issuance of that mandate, Donahue was entitled to be reinstated as directed by the ALJ. The filing of a petition for *certiorari* by DPSCS did not stay that mandate, and so Donahue's right to be reinstated was not placed in suspension until this Court denied the Department's petition for *certiorari*. The right arose on August 2, 2002.

The ALJ's order of reinstatement was not self-executing, however, even when ultimately affirmed by the Circuit Court and the Court of Special Appeals. Like orders of reinstatement generally, issued upon a finding that the employee was wrongfully terminated, it was in the nature of an injunctive order or one for specific performance, directing that Donahue *be* reinstated, but it did not, of itself, recreate the employment relationship; nor, as a practical matter, could it have that effect. Reestablishment of the employment relationship in conformance with the reinstatement order must be done by the parties themselves—the employer notifying the employee when and where to report and the employee reporting, prepared to resume work, or at least having the obligation to do so.

Until that happens, the employment has not, in fact, been restored. From the employee's perspective, if, during the pendency of the litigation, the employee has obtained another job or is engaging in other activities, he or she may continue in those endeavors until directed to report for work pursuant to the reinstatement order. The employer certainly could not legitimately contend that the reinstatement order was immediately self-executing and that the employee abandoned the employment by failing to report the next day. On the other hand, the employee may decide, for whatever reason, not to resume the employment, in which event there would be no effective reinstatement.[7] If the employee desires

---

7. Even upon a finding of wrongful termination for which reinstatement may ordinarily be the preferred remedy, courts and agencies may deny

to be reinstated but the employer refuses to comply with the order, the employee or, when the order is issued by a regulatory agency, the agency itself, may institute statutory or common law enforcement proceedings against the employer to coerce compliance. That is why regulatory agencies are usually given statutory enforcement powers and why common law remedies such as mandamus have been held available to enforce reinstatement orders. *See,* for example, 42 U.S.C. § 2000e–5(i), authorizing EEOC to commence proceedings to enforce court orders; Maryland Code, Art. 49B, § 12 (same for Maryland Human Relations Commission); and *Mayor & City Council of Ocean City v. Johnson,* 57 Md.App. 502, 470 A.2d 1308 (1984); *State ex rel. Olander v. Ohio Environmental Protection Agency,* 45 Ohio St.3d 196, 543 N.E.2d 1262 (1989); and *State v. Civil Service Board,* 226 Minn. 253, 32 N.W.2d 583 (1948), enforcing reinstatement orders through mandamus actions.

The mandate that issued on August 2, 2002, did not, therefore, of itself, restore the employment relationship between DPSCS and Donahue. DPSCS, or its counsel, was apparently hoping that this Court would review the case and reverse the reinstatement order; that hope was not dashed until October 10, 2002. Donahue, in the meanwhile, did nothing to "jump start" the restoration process, but seemed content to accrue back pay without having to return to work. The warden's letter of October 25, 2002, set November 1 as the date of reinstatement. That is the date Donahue was directed to report for work; that is the date he was obliged to report;

---

reinstatement when special circumstances make that remedy inappropriate, including situations in which the employee makes known his or her reluctance to continue the employment. *See Bledsoe v. Wilker Bros. Inc.,* 33 Fair Empl. Prac. Cas. (BNA) 127 (W.D.Tenn.1980); *Hutchison v. Amateur Elec. Supply,* 42 F.3d 1037 (7th Cir.1994); *Cowan v. Strafford R–VI Sch. Dist.,* 140 F.3d 1153 (8th Cir.1998); *EEOC v. Pacific Press Publ'g Ass'n,* 482 F.Supp. 1291 (N.D.Cal.1979), *aff'd,* 676 F.2d 1272 (9th Cir.1982). When that reluctance arises after the reinstatement order is entered which, if there are judicial review proceedings, could be several years, the employee is free to waive the reinstatement and not seek or act to restore the employment. *See Zigmond v. Civil Serv. Comm'n,* 155 W.Va. 641, 186 S.E.2d 696 (1972).

that is the date upon which his back pay was calculated; that is the first date upon which Donahue became subject to further discipline. The ALJ was correct in regarding November 1 as the commencement of the 30–day period for imposing discipline based upon the 1999 convictions. As the termination at issue occurred November 8, it was well within the 30–day period allowed by SPP § 11–106(b).

### Unavailability

As noted, SPP § 11–106(a) requires the appointing authority to meet with the employee and consider any mitigating circumstances before taking any disciplinary action. That requirement, seemingly absolute, has been construed by regulation of the Department of Budget and Management to be conditioned on the employee being available and willing to meet. COMAR 17.04.05.04D.(3). In a footnote in his brief, Donahue challenges the authority of the Department to adopt such a regulation. He asserts, "[a]s a preliminary matter," that the statutory requirement to meet is absolute and unconditional and that the Department is not authorized to "overrule or obviate a statutory requirement."

The argument, relegated to a footnote, has no merit. Statutes must be construed in a reasonable way. *See Stoddard v. State*, 395 Md. 653, 663, 911 A.2d 1245, 1250 (2006) (confirming the well-established principle that, in construing a statute, we avoid a construction "that is unreasonable, illogical, or inconsistent with common sense."). We cannot conceive that the Legislature would have countenanced the ability of an employee to preclude a State agency from ever taking proper disciplinary action by simply refusing to meet with the appointing authority or by making himself unavailable for such a meeting during the 30–day period allowed to the appointing authority under SPP 11–106(b). The statutory requirement to meet with the employee necessarily assumes a willingness on the part of the employee to meet in a timely manner with the appointing authority and to make himself/herself reasonably available for that purpose. The regulation, expressly conditioning the requirement on the willingness and availability of

the employee, adds nothing that is not implicit in the statute. We turn, then, to the critical issue of whether the ALJ properly held that Donahue was not unavailable.

In examining that issue, we do need to take account of two subsidiary matters raised in the record. First, although the Circuit Court was correct in its observation that the ALJ had made no specific finding regarding Donahue's "unavailability," but determined only that "the Employee did not refuse to meet with Management," we agree with the Court of Special Appeals that, implicit in her other discussion was an indication that the ALJ did not regard Donahue as being unavailable. She said, "[t]hrough no fault of his own, he never knew about the mitigation meeting."

We agree with the Circuit Court, however, that the ALJ's frequent and consistent reference to the mitigation conference as having occurred on November 1, 2002, rather than November 7, cannot be taken as a mere harmless typographical error. The Court of Special Appeals was wrong in simply assuming that it was "likely" otherwise. The ALJ stated in her Finding of Fact No. 23 that "[t]he Warden conducted the November 1, 2002 mitigation conference without the Employee." In discussing Donahue's charge that the warden had failed to conduct a mitigation conference at all, the ALJ responded that "[i]n fact, Management did conduct a mitigation conference, albeit in the Employee's absence on November 1, 2002, *the date he was reinstated.*" (Emphasis added). At least three more times in her opinion, the ALJ referred to the mitigation conference as having occurred on November 1. Nowhere in her opinion does she give the correct date.

The fact that the ALJ stated at least five times in her opinion that the conference occurred on November 1 and never did allude to the correct date of November 7 militates against a casual conclusion that this was a mere typographical error. That conclusion is belied as well by the ALJ's reference to the mitigation conference as occurring "on the date he was reinstated," which *was* November 1. It seems clear to us

that the ALJ made a finding that the *in absentia* mitigation conference actually occurred on November 1, and that she was simply mistaken in that belief. On this record, that finding was unsupported by substantial evidence, or, indeed, any evidence, and was therefore clearly erroneous.

We agree as well with the Circuit Court that, given the context of that erroneous finding by the ALJ, it "lies too perilously close to the underpinnings of her reasoning to conclude that [DPSCS's] substantial rights were not prejudiced." On one occasion, the ALJ found that "it was certainly not reasonable to conduct the fundamental procedural rights of § 11–106 in [Donahue's] absence, when they had no proof he had received notice of the November 1, 2002 meeting." In the same paragraph, she concluded that "[e]ven under Management's incorrectly perceived timeline, there was no reason to rush the mitigation meeting on November 1, 2002, since they had until November 16, 2002, to impose discipline."

Whether the mitigation conference occurred on November 1 or November 7 is highly relevant to the issue of Donahue's availability and the reasonableness of the warden's attempts to notify him. The warden made but one attempt, by letter, to inform Donahue to report on November 1. Had he proceeded with a mitigation conference that day, in the absence of Donahue and without any knowledge whether Donahue had received his letter, the ALJ could rightly have concluded that the warden had not complied with SPP § 11–106(a). As we shall explain, the situation is quite different with a mitigation conference held on November 7. By then, further efforts had been made to notify Donahue—multiple telephone calls extending over November 1, 2, and 3, and the alleged posting of a letter on his residence door. The facts bearing on Donahue's unavailability for a meeting on November 7 were quite different than those bearing on his unavailability for a conference on November 1. The ALJ's clear error was not harmless.

In determining whether, on this record, any reasonable trier of fact could lawfully conclude that Donahue was not unavailable during the period from October 25, 2002, when the

warden sent his letter directing Donahue to report on November 1, to November 7, when the mitigation session actually occurred, we first need to set the standard for defining unavailability, which the regulation fails to do. DPSCS takes a rather rigid position. Relying on a dictionary definition of "available"—"accessible for use; at hand; usable"—it urges that, because Donahue was out-of State, he was unavailable, and that simple fact should control. The ALJ and the courts, it contends, erred in focusing on the warden's efforts to locate Donahue; they should have looked only to whether he was "at hand," which he was not. Donahue agrees with the ALJ's and the courts' standard—whether the warden undertook "reasonable, good-faith efforts to locate and procure the employee for the meeting but [was] nevertheless unable to do so." We agree, essentially, with Donahue on this point.

Under DPSCS's theory, the warden would not have had to make *any* effort to notify Donahue of the November 1 or November 4 meeting; because he was out-of-State, it would have made no difference. That cannot be what the Legislature, in enacting the requirement of a meeting to consider mitigating circumstances, or the Department of Budget and Management, in adopting the COMAR regulation, had in mind. The requirement of a meeting prior to the appointing authority taking disciplinary action is an important right given to the employee, and that right can have meaning only if the employer makes a reasonable effort to notify the employee of the meeting.

That imperative, which underlies the standard adopted by the Court of Special Appeals, is consistent with the definitions given to the word "unavailable" in similar contexts. Health General Article, § 5–605 specifies a priority among surrogate decision makers for purposes of the Health Care Decisions Act. A person of lower priority may be selected only when a person with higher priority is unavailable. Section 5–605(a) defines "unavailable," in the closest context to this case, as when "[a]fter reasonable inquiry, a health care provider cannot ascertain the whereabouts of a surrogate decision maker." Education Article, § 8–412, dealing with the appointment of

parent surrogates when a parent is unavailable, defines "unavailable" as being when a public agency "after reasonable efforts, cannot discover the physical whereabouts of a child's parent." *See also* Environment Article, § 6–833(a), declaring a parent or legal guardian unavailable "if, following reasonable efforts, the offeror is unable to locate or communicate with the parent or guardian of the minor." Finally, we note Maryland Rule 5–804, which creates certain exceptions to the hearsay rule when the declarant is unavailable and defines "unavailability," in the closest context here, as existing when the declarant "is absent from the hearing and the proponent of the statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."

 Incorporating those principles, to the extent relevant, we conclude that, for purposes of SPP § 11–106(a), an employee may be regarded as unavailable to meet with the appointing authority when (1) the appointing authority has made a reasonable, good faith effort to notify the employee of the meeting, (2) the employee has been given a reasonable amount of time to receive and respond to the notice, and (3) the employee fails to make a reasonable response to the notice and to appear at the meeting.

 Applying that standard, we hold that, on this record, the warden could properly conclude that Donahue was unavailable. Donahue was as aware of the mandate of the Court of Special Appeals and the denial of *certiorari* by this Court as DPSCS, and, although it was the obligation of DPSCS to implement the reinstatement and call any meeting that would be necessary if the warden intended to take further disciplinary action, Donahue certainly could have made an inquiry at any time following the issuance of the mandate and, if he knew that he was going to be out-of-State for seventeen days and unavailable to receive communications from DPSCS during that time, he could have alerted the Department. In the mistaken, but not wholly unreasonable, belief that he was not obliged to reinstate Donahue until advised by the Assistant Attorney General on October 17, 2002 (or, at the earliest, On

October 10), the warden acted promptly in attempting to inform Donahue, on October 25, 2002, by both certified and regular mail delivered to his most recently known, and correct, address, to report on November 1. Had Donahue been home, he would have had nearly a week's notice of the meeting.

The warden, of course, did not know, and could not have known, that Donahue did not receive the two letters. When Donahue did not appear on November 1, the warden postponed the meeting to November 4—the following Monday—and had his assistants call Donahue's correct telephone number multiple times throughout the day and evening of November 1, and on November 2 and possibly November 3, as well. Captain Matthews reported that, on at least one occasion, an answering machine activated. When Donahue failed to appear on November 4, the warden postponed the meeting to November 7. The ALJ found as a fact that the warden acted in good faith, and we agree with that conclusion.

Donahue complains that, with no response from him to the letters and telephone calls, the warden was obliged to call his lawyer or his union. Apart from the conceded fact that the lawyer did not know where Donahue was and there is no indication in the record that the union did either, the warden was not required to search the ends of the earth to find him. This was not a police investigation into a missing person. The warden had but thirty days to hold the meeting, give fair consideration to any mitigating factors that Donahue or anyone else might present, and complete the process, which required an approval from the Secretary of DPSCS. In the absence of any information indicating where Donahue might be or, if he was not, in fact, at home and was simply ignoring the communications, when he might be returning, the warden was not required to keep postponing the meeting from day to day or week to week, waiting to see if Donahue might call, write, or appear. Wardens have other things to do. We hold that the warden made a reasonable, good faith effort to notify Donahue, that Donahue was given a reasonable amount of

time to receive and respond to the notice, and that he failed to do so. That equates to his unavailability.

### Effect of the 1999 Convictions

 In his cross-petition, Donahue argues that the ALJ erred "in concluding that the Employee's convictions relieve the Agency of its obligation to reinstate him pursuant to the Mandate of the Court of Special Appeals." He regards the ALJ's decision as viewing the appellate mandate as "less as an order to reinstate Donahue to his position ... and more as an invitation to Donahue to apply for and be considered for that position."

That is not, however, how the ALJ viewed the matter. She stated the issue as whether "an Employee who has won reinstatement can be terminated for misconduct occurring when he was not employed by the State" and in her discussion of that issue, she made clear that the warden had not denied reinstatement to Donahue. The question was whether, *following reinstatement*, Donahue's employment could be terminated for conduct that occurred prior to the reinstatement—when he was not an employee. The ALJ expressed no doubt that the conduct in question, if it had occurred while Donahue was an employee, would warrant the termination of his employment and likened the situation to that of off-duty misconduct.

 We agree entirely with the ALJ's conclusion. The simple fact is that DPSCS is not required to hire, rehire, or keep a convicted thief as a correctional officer in a penal institution, and it does not matter whether the conviction, or the conduct that led to it, occurred while the person was an employee, before the person was an employee, or during an interval between employments.

Maryland Code, §§ 8–201 through 8–210 of the Correctional Services Article (CS) create the Maryland Correctional Training Commission and provide for its duties. CS § 8–209(a) provides that a person may not be given or accept a probationary or permanent appointment as correctional officer unless the person meets minimum qualifications established by the

Commission. Section 8–208(9) authorizes the Commission to adopt regulations to carry out the subtitle, and it has done so. COMAR 12.10.01.03A provides that applicants for correctional officer positions may receive provisional appointments if they meet the selection standards in COMAR 12.10.01.04. One of the requirements in COMAR 12.10.01.04 is a background check and criminal history investigation in accordance with COMAR 12.10.01.05. *See* COMAR 12.10.01.04D.

The investigations required under COMAR 12.10.01.05 are, among other things, to determine whether the applicant "[i]s of good moral character and reputation" and "[d]isplays the suitable behavior necessary to perform the duties of the mandated position." COMAR 12.10.01.05A(1)(a) and (c). If the criminal history investigation reveals that the applicant has been convicted of a felony or a misdemeanor for which a sentence of one year or more may be imposed, the correctional unit must provide the Commission with available information. COMAR 12.10.01.05B(4)(a). That regulation requires the Commission to disqualify an applicant for a conviction listed in COMAR 12.10.01.17B. Because Donahue's sentences of incarceration for 60 days were suspended—but only for that reason—his convictions did not fall within the list, and so the Commission was not *required* to disqualify him.[8] COMAR 12.10.17B., however, makes clear that the regulation "does not require a correctional unit to employ a correctional officer with a criminal record or prevent the unit from setting higher criminal history standards than specified in this regulation."

DPSCS did, in fact, promulgate hiring standards that are more restrictive than those governing the Commission. Those

---

8. COMAR 12.10.01.17A(3) lists as a conviction requiring disqualification "[a] misdemeanor conviction that resulted in incarceration when less than 5 years have elapsed since the applicant was released from incarceration or terminated from parole or probation, whichever last occurred." A conviction for theft under $300 (now $500) carries a possible sentence of 18 months. *See* Maryland Code, Criminal Law Art. § 7–104(g)(2). Had Donahue's 60–day sentences not been suspended, his 1999 convictions, which occurred less than five years before November 1, 2002, would have required his disqualification by the Commission.

standards, adopted in May, 2000, were in effect when the reinstatement order became effective. One of them provides that "[a]pplicants for the position of Correctional Officer shall be disqualified from employment consideration for ... '[a] conviction in any court ... for a crime punishable by imprisonment for a term of one year or more.'" That is consistent with the Commission's regulation excepts that it deletes the requirement of incarceration and is a permanent disqualification. Under the DPSCS hiring standards, therefore, Donahue was not qualified for re-employment.

Donahue seeks to escape this disqualification on the ground that those regulations apply only to "new hires" and not to him. He was not, he claims, a new hire but a permanent employee who was wrongfully terminated and ordered to be reinstated. It is not clear that he is correct in that view,[9] but even if he is, it avails him naught. If he is not a new hire, he remained subject to the Directives and Standards of Conduct established for DPSCS employees, and his conduct and convictions most assuredly violated them and warranted the discipline administered by the warden. *See infra,* n. 4.

JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM JUDGMENT OF CIRCUIT COURT FOR SOMERSET COUNTY; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT.

HARRELL, J., Concurs.

BELL, C.J. and RAKER, J., Dissent.

---

**9.** COMAR 12.10.01.06B(2) makes clear that a Commission certification loses its validity when the employee "is separated from employment." COMAR 12.10.01.03F provides for a new provisional certificate "for a formerly certified mandated employee who: (1) Has not been in a correctional mandated position for over 3 years; and (2) Meets the appropriate selection standards under Regulation .04 of this chapter." We need not resolve here whether those regulations apply to an employee whose employment was terminated, who has not worked in a correctional mandated position for over three years, but who is later ordered to be reinstated.

Concurring Opinion by HARRELL, J.

I concur in the Majority opinion for the reason that, even were I to assume the view of the Dissent as to the DPSCS's asserted error regarding its interpretation of Donahue's unavailability for the November 2002 mitigation conference(s), the result nonetheless would be the same as reached by the Majority opinion because Donahue was ineligible to become a DPSCS employee again by reason of his criminal convictions. *See* Maj. op. at 538–39, 929 A.2d at 529–30. Even though the suspension of any period of incarceration pursuant to the convictions (to which charges Donahue plead guilty) did not mandate that Donahue necessarily be deemed ineligible for employment under the relevant COMAR provisions (*see* Maj. op. at 538–39, 929 A.2d at 529), the DPSCS's permissibly more restrictive hiring standards (promulgated in May 2000) made plain that Donahue was not qualified for reemployment. There is no indication in the record extract that Donahue at any time sought to withdraw his 1999 guilty pleas or *coram nobis* relief because of the collateral consequences that his convictions would have on his employment situation with the DPSCS. Moreover, there is no proffer in the record extract of anything Donahue might have offered in mitigation of his admitted criminal activities that could have changed the result. It is abundantly clear to me, on this record, that the result reached by Warden Kupec and the Secretary of DPSCS was foreordained, as a matter of law.

RAKER, J., dissenting, BELL, C.J., joining.

I respectfully dissent. I would affirm the Court of Special Appeals holding and the ruling of the ALJ that it was unreasonable, under the circumstances presented herein, for the Warden to proceed with a mitigation conference in the absence of Donahue. In my view, Donahue was not unavailable.

I agree with the Court of Special Appeals that, although the Warden had no duty ordinarily to contact Donahue's lawyer, by "failing to take such an obvious step when the Warden had good reason to know that [Donahue] was not at home and that there was a substantial likelihood that he had not received any

notice of the mitigation hearing, strongly indicates that a good-faith effort to make sure appellant had a chance to attend the meeting was not made." Even if Donahue was ineligible for rehiring ultimately, he should have had the opportunity to attend a hearing and to present any mitigation he deemed relevant.

Chief Judge BELL has authorized me to state that he joins in this dissenting opinion.